**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

SHAWN A. WALLACE,

      Defendant-Appellant,

No. 04-3435

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 03-CR-10208-02-WEB)**

Christopher M. McHugh (Stephen M. Joseph with him on the briefs) of Joseph & Hollander, P.A., Wichita, Kansas, for Defendant-Appellant.

Brent I. Anderson, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), District of Kansas, Wichita, Kansas, for Plaintiff-Appellee.

Before **HENRY, McKAY**, and **HARTZ,** Circuit Judges.

**McKAY**, Circuit Judge.

      The questions in this case revolve around the permissible scope of questioning during a traffic stop. Defendant was convicted of possessing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and of

carrying on an unlawful activity during travel in interstate commerce, in violation of 18 U.S.C. § 1952(a)(3). Defendant filed a pretrial motion to suppress the marijuana. After an evidentiary hearing, the district court denied the motion. Reserving his right to appeal the denial of his suppression motion, Defendant subsequently pled guilty and was sentenced. He now appeals the denial of his motion to suppress and his sentence.

On December 19, 2002, Defendant and a companion were traveling on Interstate 70 in Lincoln County, Kansas. Defendant's companion was driving. They traveled in a Chevrolet Suburban towing a large trailer. A highway patrol trooper stopped the vehicle for driving 77 miles per hour in a 70 miles per hour zone.

The trooper asked the driver for his driver's license and explained to him that he was speeding. As the driver retrieved his documentation, the trooper asked him where he was coming from. He said California. The trooper asked why he had been there. The driver explained that he had attended a family wedding. The trooper asked the driver for the vehicle's registration. He explained that the Suburban had been rented by his passenger (Defendant). The trooper then asked to see the rental papers as well as Defendant's driver's license. While Defendant was producing the requested items, the trooper asked what they were hauling in the trailer. The driver said it was a dirt bike, a small motorcycle.

When the trooper asked whose it was, the driver replied that it was his. The trooper explained to the two men that he wasn't going to issue a speeding ticket and that the stop would only last a few more minutes while he verified their documentation.

The trooper passed by the trailer behind the Suburban on his way back to his patrol car. As he passed the trailer, he muttered to himself, "Big trailer for a dirt bike." Rec., Vol. II, at 125. Once back in the patrol car, the trooper asked the radio dispatcher to check the driver's and Defendant's Maryland driver's licenses and to run a criminal history check on each of them. A few minutes later, the dispatcher reported that the license plate on the trailer was registered to Defendant and that he had a valid driver's license and no criminal history. The license of the driver, on the other hand, was not on file, and the dispatcher requested additional information from the trooper about the driver.

The trooper returned to the Suburban and asked the driver if he would come back to the patrol car for a few minutes. The trooper explained to the driver that they were having trouble confirming his driver's license. He complied and accompanied the trooper to the patrol car. While the two waited for the information in the front seat of the patrol car, the trooper asked the driver what he did for a living, where he had been in California, and what kind of work Defendant did. He also asked if the dirt bike was the only thing in the large

trailer. When the driver said that it was, the trooper asked, "You don't have any weapons or, uh contraband, explosives or anything like that in there?" Rec., Vol. III, at 278. The driver replied that he did not. Sometime thereafter, the dispatcher reported that the driver had an arrest and/or conviction for auto theft in 1997 but was not currently wanted for anything. However, the dispatcher reported that she was still unable to get a confirmation on the driver's Maryland license. The driver volunteered that he had once had a Virginia license, and the trooper asked the dispatcher to check on that. While waiting on this request, the trooper asked whose wedding the driver had attended. He answered, "My cousin's." Rec., Vol. III, at 279. The dispatcher interrupted this conversation when she reported that the driver did not have a Virginia license but that he did possess an ID card from that state.

The trooper told the driver that if he did not have a valid driver's license, Defendant would need to take over driving. The trooper then went back to the Suburban to talk to Defendant, leaving the driver alone in the patrol car. He explained to Defendant that he might need to drive for the remainder of the trip. He also asked Defendant why he had been in California. Defendant said it was for his cousin's wedding. The trooper asked Defendant if he and the driver were related. Defendant replied that they were not, but were still "close, like cousins." Rec., Vol. III at 281. The trooper asked about their trip and how long they had

stayed in California. Defendant said that they were there for a couple of days. The trooper asked what they were hauling in the trailer. Defendant said it was a motorcycle. The trooper asked, "Just one motorcycle? . . . you don't have a problem with us looking in there after a bit?" *Id.* Defendant demurred, telling the trooper that "[his companion is] the driver. You got to ask him." *Id.* The trooper agreed and returned to the patrol car.

There, he asked the driver if Defendant was just a friend. He said, "No, he's my cousin." *Id.* at 282. The trooper examined the rental slip for the Suburban. The slip showed that the vehicle had been rented on December 13 in Bethesda, Maryland, and was to be returned there on December 20. The trooper asked the driver the brand of the motorcycle in the trailer. He hesitantly said, "Uh. It's a Yamaha." *Id.* The trooper asked why the men hauled the dirt bike all the way out to California. The driver explained, "It's a small bike. We got a little nephew. My cousins are out there. They have a lot of land in the back yard so we let him ride it." *Id.* at 283.

Another highway patrolman arrived on the scene, and the trooper indicated to him that he was suspicious of the two men. The trooper returned to the patrol car and told the driver that he was going to give him a warning but that Defendant would need to do the driving from that point on. He gave the driver his driver's license and a warning citation and said, "That's all I've got." *Id.* at 287. He then

asked the driver, "So you don't have a problem with me checking in there, and checking your motorcycle and everything in there?" *Id.* The driver said, "No." *Id.* The trooper said, "Okay, why don't we just open up that side door [of the trailer] if you can and I'll just jump in there real quick and take a look, okay?" *Id.* He responded, "Okay, you ready?" *Id.*

The trooper and his backup entered the trailer. They observed a small motorcycle and a couple of other small items, but the trailer was mostly empty. They noted that the motorcycle was a Honda, not a Yamaha as the driver had stated. The trooper instructed his backup to check the bottom of the floor. After a brief examination of the trailer's floor, the two troopers began to suspect that there was a false compartment under it. They could see what appeared to be an enclosed space under the floor and used a tape measure to confirm that there was, in fact, a 4- to 6-inch gap between the trailer's floor and the enclosed underside of the floor. They also observed a metal piece screwed in place all the way around the inside holding the flooring down, and they saw a number of scratch marks just above the flooring tending to indicate that the floor had been removed at one point. Based on his training and experience, the trooper suspected that the men were storing contraband in this false compartment below the trailer's floor.

The trooper informed the driver and Defendant that it looked like there was a false compartment underneath the trailer's floor. He asked Defendant if he

knew anything about it. Defendant stated that he did not. The trooper then asked Defendant if he had a problem with the officers getting under the floor and checking it out. Defendant replied, "Yeah, cause I don't understand why we're going through all this in the first place." *Id.* at 290. The trooper again explained that it looked like there was a false compartment under the trailer's floor and that this gave him probable cause to hold the trailer. Despite the Defendants' protests, the trooper called an additional highway patrolman who had a drug-sniffing dog with him and requested his assistance at the scene. The additional trooper said that he and the dog would be there in twenty to thirty minutes. The Defendants, becoming more agitated by the moment, demanded to know what the holdup was, and when they could leave. The trooper told them to take a seat, as they did not have the option of leaving. The driver and Defendant asked if they could still revoke their consent to search the trailer. The trooper told them they could not.

While the troopers waited for the drug-sniffing dog to arrive, they continued to investigate the trailer themselves. Inside it, they saw that screws in the metal piece securing the floor were marked up and stripped as though they had been removed several times. They used an electric screwdriver and attempted to remove the metal piece holding the flooring down, but were unsuccessful. The trooper asked the driver what brand the trailer was, and he stated that he did not know. The troopers then decided to call "George" at the local "Service Center" to

ask him if the manufacturer made this type of trailer with a large gap under the floor. Unfortunately, George's area of expertise didn't extend quite that far, and he did not know. Undeterred, the troopers found an 800-number for the manufacturer of the trailer, and spoke with individuals familiar with that particular type of trailer. The individuals representing the manufacturer informed the trooper that the gap in the floor was definitely not consistent with the way the trailers were built at the factory. After concluding the conversation with the manufacturer, the troopers also noticed a number of marijuana seeds on the floor of the trailer.

Eventually, the drug-sniffing dog arrived and indicated that it had detected the odor of a controlled substance. The troopers then proceeded to punch a hole in the plywood floor and found a large quantity of marijuana below.

The driver and Defendant were indicted with one count of possessing approximately 340 pounds of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a) and (b)(1)(B), along with one count of traveling in interstate commerce to carry on an unlawful activity, in violation of 18 U.S.C. § 1952(a)(3).

At the district court, both Defendants filed a motion to suppress the evidence found in the trailer. The district court denied the motion finding the search and seizure of the trailer reasonable under the Fourth Amendment.

Defendant entered a conditional plea of guilty on both counts, reserving his right to appeal the district court's denial of the motion to suppress.[1] After reviewing the presentence report and applying the United States Sentencing Guidelines (Guidelines), the district court found that Defendant met the safety valve provisions set forth in 18 U.S.C. 3553(f), and, as such, Defendant fell within the Guideline sentencing range of 41-51 months. The district court sentenced Defendant to 41 months' imprisonment–the low end of the Guidelines range. Defendant now appeals the district court's denial of his motion to suppress and his sentencing.

In reviewing a district court's denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and we view the evidence in the light most favorable to those findings. *United States v. Caro*, 248 F.3d 1240, 1243 (10th Cir. 2001). We review the district court's determination of Fourth Amendment reasonableness de novo. *Id.*

On appeal, Defendant first asserts that the trooper asked a number of questions that were overly intrusive and exceeded the scope of the traffic stop. We conduct a two-step inquiry when considering the constitutionality of a traffic stop under the Fourth Amendment. First, we determine whether the officer's

---

[1]The driver of the vehicle pled guilty to Count 1 of the indictment and was sentenced to 37 months' imprisonment. He has not appealed his conviction or sentence.

action was justified from its inception, and, second, whether the action was reasonably related in scope to the circumstances that justified the interference. *United States v. Cline*, 349 F.3d 1276, 1286 (10th Cir. 2003). Defendant does not contend that the initial stop of his vehicle for speeding was improper; therefore, we will only address the second part of the test–whether the trooper's questions were reasonably related to the scope of the traffic stop. The recent Supreme Court opinion of *Muehler v. Mena*, __U.S.__, 125 S. Ct. 1465 (2005), is instructive on the point. In *Muehler*, the Court held that mere police questioning does not constitute a seizure under the Fourth Amendment. *Muehler*, __U.S. at__, 125 S. Ct. at 1471. As long as the trooper's questioning did not extend the length of the detention, which has not been challenged by Defendant in this case, there is no Fourth Amendment issue with respect to the content of the questions. *See United States v. Santos*, 403 F.3d 1120, 1132 n.6 (10th Cir. 2005).

Defendant next contends that his consent to the trooper's search of the trailer was not validly obtained because it was the product of an unconstitutional roadside interview, and the consent was given immediately after the unconstitutional roadside interview, allowing no time for any intervening circumstances.

Generally, "[a] driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver"

further. *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). But an officer can extend the stop if he either has a "reasonable articuable suspicion of other crimes or the driver voluntarily consents to further questioning." *Id.* The government argues that the encounter between the trooper and the driver was consensual, and, therefore, reasonable suspicion was not required. "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *Id.* (citation omitted). A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *United States v. Elliott*, 107 F.3d 810, 814 (10th Cir. 1997) (citation omitted). Once such a consensual encounter begins, an officer is not required to inform a suspect that he does not have to answer the officer's questions or that he is free to leave at any time. *West*, 219 F.3d at 1176-77. So an unlawful detention occurs only when the suspect has an "'objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.'" *Id.* (citing *Hernandez*, 93 F.3d at 1498).

In this case, there is no evidence that the trooper used a show of authority that would indicate to a reasonable person that he was not free to leave. Indeed, the record is clear that the trooper told the driver, "That's all I've got." Rec.,

Vol. III, at 287. Although there were two troopers at the scene, only the original trooper asked the driver for his consent. In that colloquy, there is no evidence that the trooper displayed his weapon, physically touched the driver, or used a commanding tone of voice indicating that compliance might be compelled. *See Elliott*, 107 F.3d at 814. Accordingly, we hold that the driver was free to leave and that his consent was voluntary and not improperly tainted by the trooper's questions during the traffic stop.

Defendant further asserts that the trooper lacked probable cause to continue searching the trailer after he and the driver revoked their consent saying, "We don't want to be searched no more." Rec., Vol. III, at 291.

As discussed above, the driver initially consented to the trooper's search of the trailer. Thus, the trooper's first entrance into the trailer was unquestionably proper. After briefly inspecting the trailer for a few moments, the trooper noticed that the floor was made of a plywood-type material, there appeared to be an enclosed compartment under the floor, there was a metal piece screwed in all the way around the inside holding the flooring down, and there were scratch marks just above the flooring. These observations gave the trooper the distinct impression that a hidden compartment existed beneath the trailer. The trooper verbalized his concern about the compartment to the Defendants. It was at that point that the Defendants revoked their consent, and the trooper explained to them

-12-

that their consent was no longer necessary as he had "probable cause" to detain the trailer. Rec., Vol. III, at 291-92.

The trooper did not need "probable cause" to detain the trailer for further investigation however. The intervening detention only required "an objectively reasonable and articuable suspicion illegal activity has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). Reasonable suspicion is determined by examining the alleged factors within "the totality of the circumstances," *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994), and is easier for an officer to demonstrate than probable cause. Factors, which when taken separately may be perfectly innocent behavior, can support a finding of reasonable suspicion when taken together. *See United States v. Arvizu*, 534 U.S. 266, 277 (2001). Conversely, "[a]lthough the nature of the totality of the circumstances makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *United States v. Salzano*, 158 F.3d 1107, 1114-15 (10th Cir. 1998) (citations and quotations omitted). In analyzing the factors that may amount to reasonable suspicion, we must be careful to "judge the officer's conduct in light of common sense and ordinary human experience . . . [but also to grant] deference to a trained law enforcement officer's ability to

distinguish between innocent and suspicious circumstances." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (citation omitted).

Here, the trooper relied on a number of factors to give him reasonable suspicion that the Defendants were transporting contraband in a hidden compartment beneath their trailer. First and foremost, the trooper and his backup determined that there was a four- to six-inch gap between the trailer's floor and the bottom of the trailer. Based on his training and experience, the trooper reasonably suspected that this irregularity evinced a hidden compartment. Such evidence of a concealed compartment can give rise to reasonable suspicion of criminal activity. *United States v. Toro-Pelez*, 107 F.3d 819, 825 (10th Cir. 1997); *United States v. Orrego-Fernandez*, 78 F.3d 1497, 1504-05 (10th Cir. 1996) ("[P]articular alterations observed by [a highway patrolman] created reasonable suspicion of drug trafficking and satisfied the requirements of the Fourth Amendment for an investigative detention.").

In addition to evidence of a hidden compartment, the trooper also observed a number of other suspicious factors about the Defendants' cross-country trip. The Defendants were hauling a junior-sized motorcycle in an oversized-trailer from Maryland to California for a trip slated to last only seven days. "[C]ontradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity." *Mendez*, 118 F.3d at 1431 (citations omitted).

-14-

Defendant claimed that he and the driver were "close friends, like cousins," Rec., Vol. III, at 281, but the driver stated that the two men were in fact cousins. The driver told the trooper that the motorcycle inside the trailer was a "Yamaha" but the bike was actually a "Honda." These types of "inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion." *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997).

Judging these several factors under the totality of the circumstances, we conclude that the trooper had an objectively reasonable and articuable suspicion that the Defendants were involved in criminal conduct. Under the circumstances, the trooper was justified in detaining the Defendants while waiting for the arrival of the drug-sniffing dog. The fact that the trooper commented that he had "probable cause" is of no moment because his action was justified by the lesser standard of "reasonable suspicion."

Inasmuch as it is undisputed that the marijuana yielding search did not occur until after the drug-sniffing dog had arrived and the trooper had spoken to the trailer's manufacturer, we need not address whether the trooper had probable cause when he detained the trailer. All the law requires is that he had reasonable suspicion for the detention, which he clearly had. Once the Defendants unequivocally withdrew their consent to search, the troopers did need probable cause to continue searching inside the trailer. However, because the Defendants

do not claim any prejudice from the troopers staying in the trailer until the drug-sniffing dog arrived, it is unnecessary to analyze the issue. The parties stipulate that the trooper had probable cause to search the trailer after he learned from the trailer's manufacturer that the trailer had been modified from its original state, and the drug-sniffing dog signaled that it had detected the odor of a controlled substance.

Finally, Defendant challenges his sentence as being imposed in violation of his constitutional rights, as recently articulated by the Supreme Court in *United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005). Because he did not raise this issue to the district court, we review for plain error. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc) (citation omitted). Under that standard, we will only reverse Defendant's sentence if Defendant can prove that the sentence imposed was (1) error, (2) which is plain, (3) which affects his substantial rights, (4) sufficient to warrant an exercise of our discretion to correct the error so long as it does not seriously affect the "fairness, integrity or public reputation of the judicial proceedings." *Id.* (quotation omitted).

We have recognized two types of *Booker* errors–constitutional and non-constitutional. *Id.* at 731-32. In this appeal, Defendant claims that the district court committed non-constitutional error when it applied the Guidelines in a mandatory fashion at sentencing.

We agree with the parties that the district court's mandatory application of the Guidelines was plain error, thereby satisfying the first two prongs of plain-error review. *See id.* We must therefore consider whether Defendant has satisfied the third and/or fourth prongs of plain-error review.

While it is debatable whether Defendant can satisfy the third prong of the plain error test because the only evidence presented to demonstrate prejudice was having been sentenced at the low end of the Guideline range, we need not decide the third prong because he fails to meet the fourth prong of the test. *See United States v. Dowlin,* 408 F.3d 647, 671 (10th Cir. 2005) (explaining that a party's failure to meet one prong of the test is a sufficient reason not to notice plain error). Under the fourth prong of the plain error test, Defendant must establish that, "the forfeited error . . . affect[s] [his] substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993) (internal quotation marks omitted). We will only correct a plain error affecting substantial rights if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (quotation omitted). This power to correct a forfeited error should be used sparingly and only "in those circumstances in which a miscarriage of justice would otherwise result." *Id.* (quotation omitted). Defendant fails to point to adequate record evidence suggesting such a miscarriage of justice. *See Gonzalez-Huerta*, 403 F.3d at 737.

The district court's denial of the motion to suppress is **AFFIRMED**.

Defendant's sentence is also **AFFIRMED**.