**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 4, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ANTONIO FLORES-OCAMPO,

    Defendant-Appellant.

No. 05-3257

(D.C. No. 04-CR-40120-JAR)

(D. Kansas)

**ORDER AND JUDGMENT**[*]

Before **TACHA,** Chief Circuit Judge, and **BRISCOE** and **LUCERO**, Circuit Judges.

Antonio Flores-Ocampo entered a conditional guilty plea to possession with intent to distribute a mixture or substance containing a detectable quantity of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1). He appeals the district court's order denying his motion to suppress evidence obtained as a result of a traffic stop and search of his vehicle. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

---

[*]     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

On September 7, 2004, Clint Epperly, a trooper with the Kansas Highway Patrol, was monitoring north-bound traffic along Interstate 35 in Lyon County, Kansas, as part of a drug interdiction program. Trooper Epperly was looking for new, rented, and out-of-state vehicles, in addition to motorists that committed traffic violations or failed to pay the required interstate toll. That day, at around nine in the morning, Trooper Epperly noticed Flores-Ocampo, a young, Hispanic male, driving a "nice looking" 2001 Nissan Maxima with an Indiana license plate. Trooper Epperly contacted dispatch and learned that the vehicle's registration was current and that the vehicle had not been reported stolen. Trooper Epperly followed Flores-Ocampo for almost three miles. He stopped Flores-Ocampo after observing the right wheels of Flores-Ocampo's vehicle fully cross the white fog line. The stop of Flores-Ocampo and the conversation that ensued between him and Trooper Epperly were recorded on video tape.

As he approached the car, Trooper Epperly observed Flores-Ocampo in the driver's seat and a woman and a child in the backseat. Trooper Epperly told Flores-Ocampo why he had stopped him, and he asked Flores-Ocampo whether he was sleepy. He also requested Flores-Ocampo's driver's license and proof of insurance. In response, Flores-Ocampo handed him a Mexican driver's license and documentation that named Gilberto Garcia as the insured. Trooper Epperly

continued to engage Flores-Ocampo in conversation, inquiring as to who owned the vehicle, where Flores-Ocampo was coming from, and where Flores-Ocampo was going. Flores-Ocampo responded that his friend Garcia owned the vehicle, he was returning from Oklahoma after visiting friends, and that he lived in Columbus, Indiana. Flores-Ocampo also informed Trooper Epperly that he was not a citizen, but Trooper Epperly never followed up on Flores-Ocampo's immigration status.[1]

Trooper Epperly told Flores-Ocampo to come back to his patrol car with him. Once they were inside the patrol car, dispatch advised Trooper Epperly that the vehicle's Indiana license plate had been issued to Delia Lopez of Columbus, Indiana. Trooper Epperly then asked dispatch to check on whether the vehicle had made any recent border crossings. Meanwhile, Trooper Epperly conversed with Flores-Ocampo, asking him how many days he had stayed in Oklahoma, where he had traveled from in Oklahoma, what his address was in Indiana, whether he worked in Indiana, how much money Flores-Ocampo was carrying in his wallet, and whether he could look inside Flores-Ocampo's wallet. In answering where he had traveled from in Oklahoma, Flores-Ocampo used an atlas

---

[1]     The videotape of the traffic stop reflects that Flores-Ocampo responded "Si" to Trooper Epperly's compound question, "Do you have passport . . . green card, illegal?" Thus, it is unclear what part of the question Flores-Ocampo answered.

and circled at least a 100-mile radius around Oklahoma City. Subsequently, dispatch advised Trooper Epperly that the vehicle had made no border crossings. Trooper Epperly then asked Flores-Ocampo if he knew Delia Lopez, and Flores-Ocampo responded that she was his friend.

Immediately after this conversation, Trooper Epperly issued Flores-Ocampo a warning for the traffic violation. Specifically, he said: "There's your warning. That's all I got. You're free to go. Do you have any questions?" The videotape of the conversation does not clearly indicate what Flores-Ocampo answered. Trooper Epperly then asked: "Can I ask you a couple of questions before you go?" Again, Flores-Ocampo said something inaudible. Trooper Epperly again asked: "Can I talk to you for a minute? Is that okay? Can I talk to you is that okay?" The videotape shows the following colloquy occurred between the two individuals:

> Epperly: We have muchos drogas on highway. Any muchos drogas en su carro?
>
> Flores-Ocampo: No.
>
> Epperly: Nada?
>
> Flores-Ocampo: No.
>
> Epperly: Any marijuana?
>
> Flores-Ocampo: No.
>
> Epperly: Any cocaine?

-4-

Flores-Ocampo:  No.

Epperly:  Nada?  Me buscar por drogas en su carro?  Is okay?
Gracias.

At the suppression hearing, Trooper Epperly testified about his attempt to

obtain Flores-Ocampo's consent to search the vehicle in light of the language

barrier:

Q.  And did you have any difficulty in communicating with him when
you asked for consent to search his automobile?

A.  No.  I did have to ask him in Spanish.  I asked him first in
English.  He kind of gave me a puzzled look, so I asked him if it was
okay if I could look in his car for drugs.  Which in my broken
Spanish is: Is it okay if I buscar su carro for druggos?  Can I look in
your car for drugs.

. . .

Q.  And did he think about that, or did he respond immediately?

A.  He responded.  He shook his head and replied yes.  He shook his
head and replied yes.

Q.  Did you have any indication during the time that you were
with him that you and he were not able to communicate
reasonably ?

A.  No, I didn't believe so.

Q.  Did you think that between your use of Spanish and his use of
English that the messages were being communicated appropriately
between you and he?

A.  Yes.

App. at 154-55.

Trooper Epperly and Flores-Ocampo then stepped out of the patrol car. In the meantime, another officer had arrived on the scene. During Trooper Epperly's search of the vehicle, he opened the trunk and found a single suitcase. He believed that one suitcase was inadequate for a family traveling with a baby on a three-day trip to Oklahoma City. Trooper Epperly also searched the door on the driver's side and noticed a pouch of tools, including a flat-blade screwdriver. Trooper Epperly thought the presence of these tools was unusual. He later found some tool marks in the gas tank area underneath the backseat of the car. Based on his observation of the tools and the location of the tool marks, he suspected there might be contraband hidden in the gas tank. As a result, Trooper Epperly informed Flores-Ocampo that he wanted to search the gas tank for drugs and he asked Flores-Ocampo to follow him to Williams Automotive in nearby Emporia, Kansas.

Once they arrived at Williams Automotive, Trooper Epperly invited Flores-Ocampo to stay in the waiting area. During his attempt to search the gas tank, Trooper Epperly pulled up the backseat hatch, but he did not notice any tool marks on the actual access to the gas tank. Finding no signs of tampering, Trooper Epperly put the hatch back on. At this point, Trooper Epperly was not completely satisfied due to Flores-Ocampo's story and nervous demeanor. Immediately after his search of the gas tank, and while he was getting out of the

vehicle, Trooper Epperly looked up and saw "a slight sag" around the sunroof. He tried to open the cover to the sunroof, but it would not move. Using his pen light to see what was causing the cover to remain in place, Trooper Epperly discovered several bundles of cocaine.

## II.

This court reviews de novo a district court's determination of the reasonableness of a search and seizure under the Fourth Amendment. United States v. Abdenbi, 361 F.3d 1282, 1287 (10th Cir. 2004). When reviewing a denial of a motion to suppress, we look at the totality of the circumstances and view the evidence in the light most favorable to the government. United States v. Gay, 240 F.3d 1222, 1225 (10th Cir. 2001). Further, we accept the factual findings of the district court unless they are clearly erroneous. United States v. Williams, 271 F.3d 1262, 1266 (10th Cir. 2001). "A finding of fact is 'clearly erroneous' if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." Manning v. United States, 146 F.3d 808, 812 (10th Cir. 1998).

## III.

### A. Scope of Consent to Search

Flores-Ocampo contends that Trooper Epperly exceeded the scope of his

consent when he searched the vehicle's sunroof at Williams Automotive. According to Flores-Ocampo, a reasonable person would not have understood his roadside conversation with Trooper Epperly as granting consent to search any areas of the vehicle beyond the gas tank.

"Whether a search exceeds the scope and duration of consent is a question of fact, reviewable for clear error. . . ." United States v. Rosborough, 366 F.3d 1145, 1150 (10th Cir. 2004). "The scope of a search is generally defined by its expressed object," Florida v. Jimeno, 500 U.S. 248, 251 (1991), and "is limited by the breadth of the consent given," United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996) (citation omitted). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251.

The district court rejected Flores-Ocampo's arguments concerning the scope of his consent, concluding that the search of the sunroof at Williams Automotive was permissible because Flores-Ocampo never withdrew or limited his consent to search the car for drugs either at the roadside, or Williams Automotive. We conclude that the district court's ruling is not clearly erroneous.

On appeal, Flores-Ocampo does not dispute that: (1) he gave consent, without limitation, to the roadside search of his vehicle; (2) he failed to object to

the scope of the search at Williams Automotive; (3) he voluntarily waited in the customer area at Williams Automotive; and (4) he did not attempt to withdraw his consent at any time. Aplt. Br. at 11-12. We have repeatedly held that a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds the scope of what he later claims was a more limited consent, is an indication the search was within the scope of consent. See United States v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998); United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996); McRae, 81 F.3d at 1538; United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994).

Contrary to Flores-Ocampo's suggestion, we do not view the search at Williams Automotive as a "second search" which had a limited purpose of opening the vehicle's gas tank. Admittedly, after finding tools in the door on the driver's side and tool marks around the access to the gas tank, Trooper Epperly focused his attention on the gas tank. Due to the lack of proper tools, along with safety concerns arising from the possibility of decoy vehicles on the road, Trooper Epperly elected to have Flores-Ocampo follow him to Williams Automotive to check the gas tank for contraband. However, Trooper Epperly's roadside statements do not indicate that his search of the vehicle was otherwise completed. Trooper Epperly's stated desire to continue his search at another location did not

nullify Flores-Ocampo's initial, unlimited consent to search the vehicle for drugs. Further, Flores-Ocampo was not restricted from watching the search of the vehicle at Williams Automotive and availing himself of a better opportunity to withdraw or revoke his consent. Flores-Ocampo concedes that he voluntarily stayed in the waiting room while the search was conducted. We conclude that Flores-Ocampo's unrestricted roadside consent to search the vehicle for drugs continued after he drove the vehicle to Williams Automotive. This consent authorized Trooper Epperly to search the vehicle's sunroof after he failed to find any drugs in the gas tank.

### B. Knowing and Voluntary Consent to Search

Flores-Ocampo argues that he did not give unequivocal consent to search his vehicle at Williams Automotive. Specifically, he contends that throughout the traffic stop, Trooper Epperly phrased commands as questions, and that Trooper Epperly's "request" to follow him to Emporia was also a command phrased as a question. Flores-Ocampo also emphasizes the difficulty he and Trooper Epperly had in communicating due to Flores-Ocampo's limited ability to speak English. As an example, Flores-Ocampo cites the following exchange from the videotape:

> Epperly: Okay, um, will you, will you follow me?
>
> Flores-Ocampo: [Inaudible.]
>
> Epperly: Huh? I want to look in your gas tank.

-10-

Flores-Ocampo: Okay.

Epperly: Is there anything in your gas tank?

Flores-Ocampo: No.

Epperly: No drogas? No . . .

Flores-Ocampo: No. . . [Inaudible].

Epperly: Nada?

Flores-Ocampo: [Inaudible].

Epperly: Okay. You follow me?

Flores-Ocampo: Okay.

Epperly: We go up here, turn around . . . , and go into Emporia, and me look.

Flores-Ocampo: Okay.

Epperly: Okay?

Flores-Ocampo: Okay, no problem.

Epperly: Gracias.

Focusing on the beginning of the conversation, Flores-Ocampo maintains that he never provided an affirmative response to the question "will you follow me?" and that he answered "OK" to the statement "I want to look in your gas tank." As to the remainder of the dialogue, Flores-Ocampo believes that whether Trooper Epperly's words were demands, requests, or polite instructions is ambiguous. Even assuming that he responded affirmatively to Trooper Epperly's

-11-

"requests," Flores-Ocampo characterizes his responses as a voluntary submission to authority. In short, Flores-Ocampo posits that there is no indication that he understood that he had a right to say "no."

"Whether a party has voluntarily consented to a search is a question of fact that the district court must evaluate in view of the totality of the circumstances." United States v. West, 219 F.3d 1171, 1177 (10th Cir. 2000) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). "Because voluntariness is a question of fact, the court must accept the district court's finding unless it is clearly erroneous. Id. (citing United States v. Davis, 197 F.3d 1048, 1050 (10th Cir. 1999)).

The government bears the burden of establishing that Flores-Ocampo's consent was freely and voluntarily given to validate a search based on consent. United States v. Sandoval, 29 F.3d 537, 539 (10th Cir. 1994). "First, the government must proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." McRae, 81 F.3d at 1537 (internal quotations marks omitted). Second, the government must establish that consent was given without duress or coercion. Id. Here, the existence of a language barrier between Trooper Epperly and Flores-Ocampo is also relevant to whether Flores consented. See United States v. Hernandez, 913 F.2d 1506, 1510 (10th Cir. 1996).

The district court concluded that Flores-Ocampo knowingly and voluntarily consented to follow Trooper Epperly to Williams Automotive. The court reasoned that Flores-Ocampo's verbal and non-verbal conduct demonstrated sufficient understanding of the English language. Further, the court refused to construe Trooper Epperly's request as an instruction or command. Rather, the court noted that Trooper Epperly phrased his request as a question, using the word "will," and communicated to Flores-Ocampo in a non-threatening manner. The district court also determined that the record lacked any other signs of a coercive show of authority. Again, we conclude that the district court's ruling was not clearly erroneous.

Flores-Ocampo places too much emphasis on the beginning of his exchange with Trooper Epperly. As the government points out, any ambiguity resulting from Flores-Ocampo's response to Trooper Epperly's first question is cleared up by the remainder of the conversation. Viewing the conversation as a whole, we agree with the district court's determination that Flores-Ocampo understood Trooper Epperly's request to follow him to Williams Automotive and voluntarily consented to that course of action. Indeed, Flores-Ocampo exhibited his understanding of Trooper Epperly's request by his actions of turning his vehicle around and following the trooper to Williams Automotive. Trooper Epperly's

non-coercive manner throughout the exchange also supports this outcome.[2]

## C. Scope of Questioning

Finally, Flores-Ocampo maintains that Trooper Epperly exceeded the permissible scope of a traffic stop by asking him questions unrelated to the stop.[3]

We have repeatedly held that routine traffic stops are analyzed "under the principles pertaining to investigatory detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005) (citing United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc)). "We conduct a two-step inquiry when determining the constitutionality of a traffic stop, considering first whether the officer's action was justified at its inception, and second, whether it was reasonably related in scope to the circumstances that justified the interference in the first place." Id.

On appeal, Flores-Ocampo does not contest the validity of the initial traffic stop, but instead focuses on Terry's scope requirement. He maintains that Trooper Epperly posed several questions about his travel plans, employment, and

---

[2]     We note that the district court stated that one indicator to demonstrate coercion–the existence of more than one officer–was not present. The video, however, shows another officer walking by the car after Flores-Ocampo had already agreed to the initial roadside search. In any event, Flores-Ocampo fails to argue that the presence of this second officer affected his consent to follow Trooper Epperly to Williams Automotive.

[3]     As to this issue, Flores-Ocampo does not contest any of the district court's factual findings. Aplt. Br. at 21.

the amount of money he was carrying on his person–which had nothing to do with the initial stop for a lane violation–all in an effort to fish for evidence of other possible crimes. Flores-Ocampo argues that Trooper Epperly turned a routine traffic stop into an unconstitutional roadside interrogation because he asked these questions without a reasonable suspicion of criminal activity. As a result, Flores-Ocampo contends that the district court should have suppressed the drugs subsequently discovered as fruit of the poisonous tree.[4]

In United States v. Wallace, 429 F.3d 969 (10th Cir. 2005), we addressed a similar challenge to the scope of an officer's questions during a routine traffic stop. While the officer and Wallace waited in the officer's patrol car for a confirmation of Wallace's driver's license, the officer asked him about his travel plans, employment, and the contents of a trailer which he was hauling (the trailer was later discovered to contain contraband). Id. at 971-73. On appeal, Wallace argued that several of the trooper's questions were intrusive and beyond the scope of a traffic stop. Id. at 974. Relying on the Supreme Court's decision in Muehler v. Mena, 125 S.Ct. 1456 (2005), for the proposition that "mere police questioning does not constitute a seizure under the Fourth Amendment," we stated: "As long

---

[4] In his brief, Flores-Ocampo argues that his subsequent consent to the roadside search was not a sufficient act of free will to purge the primary taint of Trooper Epperly's alleged illegal questions. Aplt. Br. at 35-36. The government concedes the point, stating that if we conclude that Trooper Epperly's questions violated the Fourth Amendment, then the evidence obtained against Flores-Ocampo is tainted and should be suppressed. Applee. Br. at 36 n.13.

as the trooper's questioning did not extend the length of the detention, which has not been challenged by Defendant in this case, there is no Fourth Amendment issue with respect to the content of the questions." Id. (citing United States v. Santos, 403 F.3d 1120, 1132 n.6 (10th Cir. 2005)); see also United States v. Alcaraz-Arellano, --F.3d--, 2006 WL 805323, at *3-4 (10th Cir. Mar. 30, 2006) (reaffirming that under Muehler and Wallace, as long as an officer's questions do not appreciably extend the detention, the content of the questions is not subject to challenge under the Fourth Amendment). As in Wallace, Flores-Ocampo does not contend that Trooper Epperly's questions extended the length of his detention. Accordingly, Flores-Ocampo's challenge to the scope of Trooper Epperly's questions raises no Fourth Amendment concerns.

AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

-16-