F I L E D
Tenth Circuit

PUBLISH

**January 19, 2007**

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 05-4255

ADRIAN T. STEWART,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:04-CR-00024 BSJ)**

Scott C. Williams, Salt Lake City, Utah, for Defendant-Appellant.

Diana Hagen, Assistant United States Attorney (Brett L. Tolman, United States Attorney, with her on the briefs), Salt Lake City, Utah, for Plaintiff-Appellee.

Before **HENRY**, **HOLLOWAY**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

A traffic stop of Adrian T. Stewart's car in Heber City, Utah, led to the discovery under his seat of a loaded .9 millimeter pistol with the safety off and a package of methamphetamine hidden in a rollerblade. Mr. Stewart moved to suppress this evidence, arguing that the officer's question that led to the

discovery of the gun, and the subsequent search of his vehicle, violated his Fourth Amendment rights. The district court denied his motion, and a jury convicted him of methamphetamine possession. The government dismissed the gun charge. He now appeals from the district court's denial of his suppression motion.

In light of the Supreme Court's recent decision in *Muehler v. Mena*, 544 U.S. 93 (2005), we hold that the officer's question was not a Fourth Amendment violation because—as Mr. Stewart concedes—it did not prolong the length of the traffic stop. We also hold that the vehicle search was proper under the automobile exception to the warrant requirement. We therefore **AFFIRM** the district court's denial of Mr. Stewart's motion to suppress.

**FACTS**

On September 11, 2003, Sergeant Jeffery Winterton of the Wasatch County Sheriff's Office received a phone call from an informant "indicat[ing] that there was a vehicle parked at a location in Heber City, [Utah,] and that every time that vehicle was in town there was dope in it." R. Vol. III, at 8. At first, Sergeant Winterton rebuffed the informant's invitation to come see the vehicle, citing his heavy workload. He eventually relented, however, and met the informant in a McDonald's parking lot. The two traveled together in Winterton's car to the Bear Mountain Chalet, a Heber City motel, where the informant pointed out a white Chevrolet Tahoe backed into a motel parking stall. It bore an Idaho license plate. Winterton saw that the Tahoe lacked a front license plate as both Utah and Idaho

law require. Idaho Code Ann. § 49-428(1); Utah Code Ann. § 41-1a-404(1). Because no one was in or around the Tahoe at that time, and because he had other work to do, Winterton returned the informant to his own car at McDonald's and continued working on his previously scheduled tasks.

More than two hours later, Sergeant Winterton returned to the Bear Mountain Chalet's parking lot and saw that the Tahoe was still there. He reconnoitered and observed a woman open the Tahoe's passenger side front door and repeatedly walk from there to the Tahoe's rear hatch. At the time, he was unable to discern what the woman was doing. He also saw that the driver's door was open, but he did not see anyone other than the woman near the Tahoe. The woman eventually sat in the front passenger seat and closed the door. Approximately one minute later, the driver's door shut, and the Tahoe left the parking lot.

Sergeant Winterton followed the Tahoe. He tried to run a records search but was unable to see the Tahoe's license plate number because some straps from a bicycle rack were obscuring it. Winterton then turned on his emergency lights and stopped the Tahoe.

The driver was Adrian Stewart. When Sergeant Winterton asked him for his driver's license and registration, Mr. Stewart "became very nervous" and "delayed" giving a response. *Id.* at 13. Stewart "look[ed] around inside the

vehicle . . . then said he thought" his license was "in the back." *Id*. He then "made a furtive movement to the back of the vehicle." *Id*.

Sergeant Winterton told Mr. Stewart to stop reaching for the backseat. He asked if Stewart could obtain his driver's license from the back of the Tahoe if Stewart stepped out of the car. Mr. Stewart said that he could. Before opening the door and letting Mr. Stewart out of the vehicle, Sergeant Winterton "asked Mr. Stewart if he had any weapons or contraband in the vehicle that [Winterton] needed to be concerned about." *Id.* at 13. When Stewart responded that he had a gun under the driver's seat, Sergeant Winterton asked him to exit the Tahoe. He did, and Winterton escorted him to the back of the vehicle.

While Mr. Stewart waited, Sergeant Winterton checked under the driver's seat and found in a pistol case a loaded .9 millimeter handgun with the safety off. This discovery prompted Winterton to arrest Mr. Stewart. He did not, however, search the vehicle incident to this arrest. Instead, he received permission from Mr. Stewart to enter the Tahoe for the limited purpose of finding Stewart's driver's license. After several failed attempts to find the license, and repeated calls to dispatch, Sergeant Winterton was able to verify that Mr. Stewart had a valid Idaho's driver's license. Winterton then took Mr. Stewart to jail.

Before leaving, however, Winterton called for other officers to impound the Tahoe and inventory its contents. One of those was Deputy Gregory Royal, a dog handler. Deputy Royal arrived to impound the Tahoe, but decided to deploy his

-4-

narcotics detection dog Boomer before doing so. Boomer had been certified in Colorado as a narcotics detection dog in August 2003—approximately one month before this sniff occurred—and he had not yet been certified in Utah. Deputy Royal started Boomer "at the back of the vehicle on the passenger side, and [he] walked Boomer around, up the passenger side, around the front, down the driver's side of the vehicle, where Boomer then alerted" on the rear driver's side by aggressively scratching at the Tahoe. *Id.* at 50–51.

Deputy Royal notified Sergeant Olsen of the alert and put Boomer away. The two officers then began to inventory the Tahoe's contents. No search, inventory or otherwise, occurred until after Boomer alerted. During the inventory search, the officers found a pair of rollerblades in the Tahoe's rear hatch, on the driver's side of the car. They discovered inside one rollerblade a four- to five-inch-long package that "was wrapped in duct tape which appeared to have maybe a sock that was showing on the corner that was poking out." *Id.* at 52. Based on Deputy Royal's training, he suspected the package contained narcotics. Royal contacted Sergeant Olsen, another officer on the scene, who opened the package to discover a white, crystal-like substance that turned out to be methamphetamine.

Mr. Stewart was eventually indicted for possession of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and for possession of a firearm by a restricted person in violation of 18 U.S.C. § 922(g)(9). A jury convicted him, and he was

sentenced to ninety-seven months imprisonment and forty-eight months of supervised release.

**DISCUSSION**

**I.    Winterton's Question to Stewart Was Constitutional**.

Mr. Stewart bases his first argument—that Winterton violated his Fourth Amendment rights by asking about the presence of weapons or contraband—on *United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001) (en banc).  In *Holt*, a majority of this Court sitting en banc "delineate[d] the scope of permissible questioning during a routine traffic stop," *id*. at 1217, by holding "that both the length and scope of a traffic stop are relevant factors in deciding whether the stop comports with the Fourth Amendment," *id*. at 1227.  Discussing the "scope" aspect, we held that an "officer's question about the existence of a loaded weapon in the vehicle" did not violate the driver's Fourth Amendment rights because that inquiry "was justified on the grounds of officer safety."  *Id*. at 1217.

The en banc *Holt* court, however, split on the question presented here: whether the Constitution permits officers to ask about unloaded weapons or other contraband.  Four judges "reject[ed] the government's invitation to adopt" a "bright-line rule allowing an officer conducting a traffic stop to ask the driver about the presence of weapons, absent reasonable suspicion that the driver may be armed and dangerous."  *Id*. at 1230 (opinion of Briscoe, J.).  One judge saw no constitutional problem with such questions as long as they did not "prolong the

duration of the stop or alter its fundamental character as a *Terry*-type detention."
*Id.* at 1237 (opinion of Henry, J.). And four judges preferred not to resolve that question in that case due to an inadequately developed factual record. *Id.* at 1226–27 (opinion of Ebel, J.).

Thus, following *Holt*, the constitutionality of inquiries such as Winterton's to Mr. Stewart was an open question. So if *Holt* were the most recent decision on this subject, Mr. Stewart's argument might well have merit. Unfortunately for him, it is not. The Supreme Court has since adopted Judge Henry's view in *Holt* by holding that the content of police questions during a lawful detention does not implicate the Fourth Amendment as long as those questions do not prolong the detention. *Muehler v. Mena*, 544 U.S. 93, 101 (2005). We have applied *Muehler* in traffic stop cases to resolve Fourth Amendment objections similar to Mr. Stewart's. *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258–59 (10th Cir. 2006); *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005).

We now make explicit what we implied in *Alcaraz-Arellano* and *Wallace*: in light of *Muehler*, the language from *Holt* approving traffic stop questions only when the officers specifically mention *loaded* weapons is no longer good law. *See Alcaraz-Arellano*, 441 F.3d at 1258 ("In light of *Muehler*, we have held that '[a]s long as the [deputy's] questioning did not extend the length of the detention, . . . there is no Fourth Amendment issue with respect to the content of the questions.'" (quoting *Wallace*, 429 F.3d at 974)). The correct Fourth Amendment

inquiry (assuming the detention is legitimate) is whether an officer's traffic stop questions "extended the time" that a driver was detained, regardless of the questions' content. *Muehler*, 544 U.S. at 101.

Here, Mr. Stewart concedes in his reply brief that "[i]t certainly can't be said that [Sergeant Winterton's] question in and of itself appreciably extended the duration of the stop." Reply Br. 5. This admission ends our inquiry. We therefore affirm the district court's ruling that Winterton's query—even though it sought information about "*any* weapons or contraband in the vehicle," R. Vol. III, at 13 (emphasis added), not just loaded ones—was constitutional.

## II. The Tahoe Search Was Constitutional under the Automobile Exception to the Warrant Requirement.

Mr. Stewart next argues that the district court erred by holding that the search of his Tahoe was a lawful search incident to arrest. Citing this Court's decision in *United States v. Dennison*, 410 F.3d 1203, 1209 (10th Cir. 2005), the government concedes that this ruling is erroneous because Mr. Stewart had left the scene and was en route to the police station when the police searched his Tahoe. Appellee's Br. 13–14. The government nevertheless asks us to affirm on the alternative ground that the search was justified under the automobile exception to the warrant requirement. Because there are sufficient grounds in the record to support the government's alternative theory, *see United States v. Ledford*, 443 F.3d 702, 707 (10th Cir. 2005), we affirm on that basis.

"The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). "A canine alert gives rise to probable cause to search a vehicle." *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005). This is so even when the dog alert occurs during a warrantless sniff on "the exterior of a vehicle during a lawful traffic stop" because such sniffs do not implicate the Fourth Amendment. *Id.* (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)).

The record reveals that Sergeant Winterton had two objectively reasonable bases for stopping Mr. Stewart's Tahoe. First, it lacked a front license plate. Second, its rear license plate was obscured. R. Vol. III, at 28–29. The traffic stop was therefore lawful. And after Sergeant Winterton arrested Mr. Stewart for keeping a loaded gun in his car, another violation of Utah law, Deputy Royal arrived and deployed Boomer before anyone searched the Tahoe. *Id.* at 60–61. Boomer alerted on the Tahoe's rear driver's side by aggressively scratching at it. *Id.* at 50–51. This alert gave rise to probable cause to search Mr. Stewart's Tahoe and its contents. The officers did so, and discovered the drugs, only after Boomer alerted. *Id.* at 61. Based on these facts, we hold that the officers' search of Mr. Stewart's Tahoe was lawful under the automobile exception to the warrant requirement.

Mr. Stewart, however, urges us not to affirm on this basis. He states that he first learned of Boomer's sniff at the evidentiary hearing, and that the belated disclosure prevented him from adequately investigating it. While the timing of the disclosure may be suspect, Mr. Stewart nonetheless was able to investigate fully. His lawyer thoroughly cross-examined Deputy Royal about Boomer's training and experience. He then asked for and received more than ten days to further investigate Boomer's qualifications and Deputy Royal's report. His post-hearing investigation did not produce any new evidence that Mr. Stewart could have used to expand the scope of Deputy Royal's cross-examination. Accordingly, the exact time that Mr. Stewart learned of Boomer's alert does not change the Fourth Amendment calculus here.

Similarly, Mr. Stewart urges us to ignore Boomer's alert because the district court instructed the government to "skip the dog" and described the dog sniff as "superfluous." R. Vol. V, at 24–25. The district court made these comments, however, during oral argument on Mr. Stewart's motion to suppress, not during the evidentiary hearings on that motion. The court gave Mr. Stewart tremendous latitude in the evidentiary hearing to conduct whatever inquiry he felt was appropriate. Only after it decided that the search was properly categorized as an inventory search or a search incident to arrest did the district court limit the prosecutor's arguments about the dog sniff.

We are not limited by the district court's legal conclusions. Indeed, this is precisely the type of case susceptible to affirmance on alternate grounds: the defendant had every opportunity to develop a factual record on this issue. Our view of those facts persuades us that the dog sniff may be serendipitous, but it is not superfluous.

## CONCLUSION

We AFFIRM the district court's denial of Mr. Stewart's motion to suppress.