**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 7, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 06-8056

PATRICK KARAM,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 05-CR-59-WFD)**

Thomas B. Jubin, Jubin & Zerga, LLC, Cheyenne, Wyoming, for Defendant-Appellant.

James C. Anderson, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the brief), District of Wyoming, Cheyenne, Wyoming, for Plaintiff-Appellee.

Before **MURPHY**, **McWILLIAMS**, and **McCONNELL**, Circuit Judges.

**MURPHY**, Circuit Judge.

**I. Introduction**

Following a traffic stop and a search of his vehicle, Patrick Karam was

indicted for possession with intent to distribute more than 100 kilograms of

marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Karam filed a motion to suppress all evidence seized from his vehicle, arguing he was unlawfully detained in violation of the Fourth Amendment. The district court denied the motion. In doing so, it concluded the detention did not violate the Fourth Amendment because the officer had reasonable suspicion Karam was engaged in criminal activity. Karam then entered a conditional guilty plea, preserving his right to appeal the denial of the motion to suppress. At sentencing, the district court determined Karam qualified as a career offender pursuant to USSG § 4B1.1(a) and sentenced him to 110 months' imprisonment. On appeal, Karam challenges both the district court's denial of the motion to suppress and its application of the career offender sentencing guideline. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the district court's denial of the motion to suppress and **affirms** Karam's sentence.

## II. Background

While traveling eastbound on Interstate 80 in Albany County, Wyoming, Wyoming Highway Patrol Trooper Joseph Scimone observed an eastbound Pontiac Montana minivan driven by Karam following another vehicle too closely. Scimone activated his emergency lights and pulled Karam over to the right shoulder of the road. Scimone then approached the vehicle and asked Karam for his driver's license, registration, and proof of insurance. As he approached, Scimone looked through the windows of the vehicle and observed a stack of

neatly packaged cardboard boxes and a piece of luggage, which he later described as a "carry-on bag," set on top of the boxes behind the driver's seat. Karam provided his driver's license and a one-way rental agreement indicating the car had been rented in Los Angeles, California and would be returned in Akron, Ohio. Scimone then asked Karam to accompany him to his patrol vehicle.

When Karam got to the vehicle, he said he needed to use the restroom. Scimone responded by pointing out Karam had just passed a truck stop with restroom facilities four miles before Scimone pulled him over. Karam then made a statement which Scimone interpreted as an assertion that Karam had stopped at the truck stop exit to purchase tea. Scimone, however, had been following Karam when he passed the exit and knew Karam had not stopped there.

While Scimone and Karam were sitting in the patrol vehicle, Scimone asked Karam questions about his travel plans, including where he was coming from and where he was going. Karam explained he was traveling to Akron from Los Angeles, where he had spent the last week and a half visiting his niece. He stated he had flown to Los Angeles and then rented the vehicle to return to his home in Akron. Following this exchange, Scimone informed Karam he would be giving him a warning for following another vehicle too closely. Scimone then began to fill out the warning and attempted to run a check of Karam's driver's license with dispatch. Because Scimone mistakenly reported a number different

from the actual driver's license number, dispatch repeatedly responded that the driver's license was not on file.

Scimone continued to ask Karam questions about his travel history and his vacation in Los Angeles. When Scimone asked Karam why he chose to drive back to Akron rather than flying, Karam explained he was transporting some items, including clothes and pictures, for another niece who had recently moved back to Akron from Los Angeles to be with her sick father. Scimone then asked Karam where his niece lived in Los Angeles. Karam first responded that he did not know where she lived and then indicated she lived thirty to forty-five minutes from the Beverly Center. Scimone later characterized Karam's answers to his questions as vague.[1] Eventually, after approximately ten minutes of unsuccessful attempts to confirm the validity of Karam's driver's license, Scimone gave Karam the warning, returned his driver's license and rental agreement, and told him he could proceed on his way.

As Karam was walking back to his vehicle, Scimone asked Karam if he could ask him a few more questions and Karam agreed. Scimone again asked Karam where his niece lived in Los Angeles and specifically asked whether

---

[1]Scimone also testified Karam appeared "quite nervous" during the traffic stop. The district court, however, rejected this characterization of Karam's demeanor and found "[t]here is no indication that Mr. Karam was unusually or extraordinarily nervous." The government does not challenge this factual finding on appeal and does not rely on Karam's nervousness to support reasonable suspicion.

Karam knew her address. Again, Karam was unable to provide an address or to provide much detail regarding the location of his niece's residence. At this point, Scimone asked Karam for consent to search his vehicle and Karam refused. Scimone then told Karam he was not free to leave and informed him he was going to call a canine unit to sniff the vehicle. Scimone requested a drug detection canine unit be brought to the location of the stop. When the unit arrived, the canine alerted the officers to the presence of controlled substances. The officers conducted a search of the van and found approximately 264 pounds of marijuana.

Karam was indicted on one count of possession with intent to distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Karam filed a motion to suppress all evidence seized as a result of the search of his vehicle. In the motion, Karam argued, *inter alia*, that he was unlawfully detained in violation of the Fourth Amendment. The district court held an evidentiary hearing and ultimately denied the motion, concluding Scimone had reasonable suspicion Karam was engaged in criminal activity sufficient to justify the continued detention while awaiting the arrival of the canine unit. After the denial of the motion to suppress, Karam entered a conditional guilty plea pursuant to a written plea agreement with the government. In exchange for the guilty plea, the government agreed to recommend a three-level sentence reduction for acceptance of responsibility.

The Presentence Report ("PSR") recommended the application of the career offender sentencing guideline pursuant to USSG § 4B1.1(a). It based this recommendation on a conclusion that two of Karam's prior convictions, a 1995 Ohio conviction for trafficking in marijuana and a 1998 Ohio conviction for trafficking in marijuana and conspiracy to commit trafficking in marijuana, qualified as controlled substance offenses, as defined by USSG § 4B1.2(b). The PSR calculated Karam's total offense level as thirty-one, applying a base offense level of thirty-four under USSG § 4B1.1(b) and a three-level downward adjustment for acceptance of responsibility under USSG § 3E1.1. When coupled with a criminal history category of VI, this offense level resulted in an advisory guideline range of 188 to 235 months.

Karam objected to the application of § 4B1.1 and filed a sentencing memorandum. Karam argued it was improper to classify his 1995 Ohio conviction as a controlled substance offense because it did not necessarily involve the actual distribution of a controlled substance or the possession of a controlled substance with intent to distribute. At the sentencing hearing, the district court rejected Karam's arguments and concluded Karam qualified as a career offender. It then granted Karam a six-level downward departure pursuant to USSG § 5K1.1, based on Karam's assistance to the government in the investigation and prosecution of others. The district court calculated Karam's total offense level as twenty-five and his criminal history category as VI, resulting in an advisory

guideline range of 110 to 137 months' imprisonment.  The district court sentenced Karam to 110 months' imprisonment, a sentence at the bottom of the guideline range.

## III.  Analysis

### A.  Motion to Suppress

In reviewing a district court's denial of a motion to suppress, this court views the evidence in the light most favorable to the government and accepts the factual findings of the district court unless they are clearly erroneous.  *United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir. 2006).  The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law that is reviewed de novo.  *Id.*

Although a traffic stop is considered a seizure for purposes of the Fourth Amendment, it constitutes an investigative detention rather than a custodial arrest.  *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997).  The reasonableness of such a stop is therefore determined under the two-part inquiry established in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).  *Id.*  Under this inquiry, a traffic stop is reasonable if it is (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998) (quotations omitted).

"A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). During a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer verification of these documents and issue a citation or warning. *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004). An officer can also ask the driver questions about matters both related and unrelated to the purpose of the stop, as long as those questions do not prolong the length of the detention. *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007). Once the warning or citation has been issued and the driver's license and registration have been returned, however, the officer generally must allow the driver to proceed without further delay. *United States v. Patterson*, 472 F.3d 767, 776 (10th Cir. 2006). Further detention is permissible only if "(1) the officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or (2) the initial detention becomes a consensual encounter." *Rosborough*, 366 F.3d at 1148 (quotations and alterations omitted).

Karam does not challenge the validity of the initial traffic stop. Scimone observed Karam following another vehicle too closely in violation of Wyo. Stat. Ann. § 31-5-210. The stop was therefore "justified at its inception." *See United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) ("A traffic stop is valid

under the Fourth Amendment if the stop is based on an observed traffic violation . . . ." (quotation omitted)). Karam also does not challenge the scope of the initial detention or the questioning that occurred before Scimone asked for consent to search his vehicle. Rather, Karam asserts only that the continued detention pending the arrival of the canine unit, after the citation had been issued and his license and registration had been returned, constituted an unreasonable seizure in violation of the Fourth Amendment. Because the government does not argue this continued detention was consensual, its validity turns on whether Scimone possessed an "objectively reasonable and articulable suspicion" of criminal activity sufficient to justify detaining Karam after the purpose of the traffic stop had been completed.[2] *Rosborough*, 366 F.3d at 1148 (quotation omitted).

In concluding Scimone had reasonable suspicion to detain Karam, the district court relied on the following factors: (1) the presence of professionally packaged cardboard boxes similar to those used to transport marijuana in another case; (2) the small size of Karam's luggage which Scimone believed to be insufficient for a one-and-one-half-week trip; (3) Karam's eastbound travel from Los Angeles, a drug source area, to Ohio, a market area; (4) Karam's vague

---

[2]Karam also mentions in a footnote that the fifty-eight-minute delay pending the arrival of the canine unit exceeded the scope of an investigative detention and therefore required more than reasonable suspicion. At the suppression hearing, however, Karam expressly stated he was not challenging the length of the delay. Because Karam does not fully address this issue on appeal other than to summarily "assert[] and preserve[] that this lengthy delay is plain error under the Fourth Amendment," this court need not consider the issue.

responses to questions regarding his travel plans, the location of his niece's residence in Los Angeles, and the content of the boxes; (5) Karam's statement about having to use the restroom despite having just passed an exit with restroom facilities and his follow-up statement which Scimone interpreted as a false assertion that he had stopped at the exit; and (6) Karam's "unusual travel plans" of flying to Los Angeles and renting a vehicle to drive back to Ohio. On appeal, Karam argues these factors are insufficient to give rise to the reasonable suspicion necessary to justify his continued detention.

To determine whether an investigatory stop is supported by reasonable suspicion, this court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted). Thus, although this court discusses each of these factors individually, the ultimate question is "whether, taken as a whole, they support a finding of reasonable suspicion." *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir. 2005). While reasonable suspicion may not be based on a "mere hunch," "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (quotation omitted). Further, this court must "defer to the ability of a trained law enforcement officer to distinguish

between innocent and suspicious actions." *Santos*, 403 F.3d at 1124 (quotation omitted).

As an initial matter, this court discounts three of the factors relied on by the government and the district court to support the conclusion that reasonable suspicion was present. First, the government relies heavily on the presence of the neatly packaged cardboard boxes in the back of Karam's vehicle. Scimone testified at the suppression hearing that these boxes were significant because he was aware of another case in which a trooper found marijuana packaged in new cardboard boxes neatly stacked along the bottom of a van. The district court expressed its familiarity with the prior case and concluded the presence of these boxes was a significant factor in the reasonable suspicion analysis.

Although this court is mindful that "officers often possess expertise permitting them to understand the criminal connotations associated with facts that may seem innocent to the untrained," *Santos*, 403 F.3d at 1133, the government has not provided any *objective* basis for associating these boxes or this style of packaging with criminal activity. To the extent Scimone's suspicion of the boxes was based on a single anecdote regarding a drug stop made by another Wyoming trooper, his suspicion was wholly subjective and thus irrelevant to the reasonable suspicion calculus. Neither the government nor the district court has provided anything other than this single instance to support Scimone's association of the boxes with criminal activity. *Cf. Arvizu*, 534 U.S. at 277 (2002) (discussing

-11-

officer's "specialized training and familiarity with the customs of the area's inhabitants"). Absent any objective justification for such an association, the presence of neatly packaged cardboard boxes in the back of a vehicle is one of those circumstances so "incorrigibly free of associations with criminal activity" that "[d]eference to law enforcement officers [is] inappropriate." *Santos*, 403 F.3d at 1133. Thus, in the context of this case, even when viewed in combination with the other factors discussed below, the presence of new, neatly taped boxes in a vehicle contributes nothing to the reasonable suspicion analysis.

This court also attaches little significance to either the size of the luggage in Karam's vehicle or Karam's eastbound travel from a well-known drug source area to a large market area. The government does not argue either of these factors would alone give rise to reasonable suspicion or even that either is a particularly strong factor, but it nevertheless relies on each as a part of the overall circumstances creating reasonable suspicion. While this court recognizes even seemingly innocent factors may be relevant to the reasonable suspicion determination, "some facts are so innocuous and so susceptible to varying interpretations that they carry little or no weight." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (quotation omitted). Each of these facts falls squarely within this category. Although this court has previously considered an insufficient amount of luggage as a relevant factor, *e.g.*, *United States v. Ledesma*, 447 F.3d 1307, 1318 (10th Cir. 2006), Karam's suitcase was not so

small as to contribute significantly to reasonable suspicion. Because there are many reasons a person may choose to travel lightly, the size of the luggage in Karam's vehicle must be given only the slightest weight, if any. *See Reid v. Georgia*, 448 U.S. 438, 441 (1980) (characterizing a lack of luggage as a circumstance that could "describe a very large category of presumably innocent travelers"). Similarly, this court has discounted the significance of travel between a drug source location and a drug destination, explaining "[i]f travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention." *Santos*, 403 F.3d at 1132.

Notwithstanding the limited significance of three of the factors relied on by the district court, the circumstances viewed in their entirety were sufficient to support a conclusion of reasonable suspicion. Immediately after Karam got in Scimone's patrol car, he stated he had to use the restroom and, according to Scimone, then explained he had stopped at the last exit to get some tea. Scimone testified this statement was suspicious because Scimone had been following Karam when he passed the last exit and knew Karam did not stop there. In its denial of the motion to suppress, the district court did not make a finding as to whether Karam falsely claimed to have stopped at the prior exit, noting the recording of the traffic stop was unclear on this matter. Instead, the district court

-13-

found only that Scimone believed Karam made such a statement and that Scimone knew such a statement was false.

Contrary to Karam's assertions, the significance of Karam's statement does not turn on whether he actually claimed to have stopped at the prior exit. Even assuming Scimone was mistaken about Karam's statement, it is well established that "an officer's mistake of fact may support probable cause or reasonable suspicion . . . provided the officer's mistake of fact was objectively reasonable." *United States v. Herrera*, 444 F.3d 1238, 1246 (10th Cir. 2006) (quotation omitted). Here, the district court made an express factual finding, which is supported by the record, that Scimone understood Karam to falsely claim he had stopped at the previous exit. Implicit in this finding and the district court's reliance on it as a factor contributing to reasonable suspicion was the conclusion that Scimone's interpretation of the statement was reasonable. Viewing the evidence in the light most favorable to the government, this court agrees with the district court that, even if Scimone was mistaken, it was objectively reasonable for him to believe Karam said he stopped at the last exit. Thus, viewing the facts as Scimone reasonably perceived them to be, Karam's statement certainly contributes to an objectively reasonable and articulable suspicion necessary to justify the prolonged detention. *See United States v. Bradford*, 423 F.3d 1149, 1157 (10th Cir. 2005) (listing "conflicting" answers to "basic questions" as one factor); *Wood*, 106 F.3d at 947 (explaining "inconsistencies in information

-14-

provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity"); *cf. Santos*, 403 F.3d at 1132 (concluding false denial of criminal history was "the most powerful reason . . . for sustaining the finding of reasonable suspicion.").

The government next relies on Karam's vague responses to questions regarding his travel history and the content of the cardboard boxes in his vehicle. Specifically, the government points out that Karam was unable to remember precisely where his niece lived in Los Angeles, first stating he did not know where she lived and then explaining only that she lived approximately forty-five minutes from the Beverly Center. Similarly, when asked what items he was bringing back to Akron, Karam first said "just clothes" and then said "just pictures and stuff like that." Although Karam disputes the district court's characterization of his answers as "vague," there is ample support in the record for the district court's determination that Karam gave vague responses to Scimone's questions. Indeed, the recording of the stop confirms Karam was less than clear when answering Scimone's questions about his travel plans, where he had stayed in Los Angeles, and the content of the boxes. Vague conversation is not alone indicative of wrongdoing and this kind of conversation does not weigh very heavily in the reasonable suspicion calculus. *Id.* at 1131, 1133. Nevertheless, "[c]onfusion about details is often an indication that a story is being fabricated on the spot," and vague and evasive answers may be considered, in

conjunction with other factors, as contributing to an officer's determination of reasonable suspicion. *Id.* at 1131.

Finally, the government relies on Karam's unusual travel plans, which involved flying one-way from Akron to Los Angeles and then renting a vehicle one-way to drive back to Akron. This court's precedent regarding the significance of such travel plans is less than clear. While "unusual travel plans may provide an indicia of reasonable suspicion," this court has previously explained the combination of a one-way flight in one direction and a one-way rental vehicle in the other direction is not the type of unusual itinerary that gives rise to reasonable suspicion. *Wood*, 106 F.3d at 946-47. In a more recent case, however, this court concluded the purchase of "a series of one-way plane tickets and one-way car-rentals" was "financial[ly] illogic[al]" and "defied common sense" and therefore was a factor contributing to reasonable suspicion. *Bradford*, 423 F.3d at 1157-58. Because the travel plans described by Karam were not implausible and were consistent with innocent behavior, this court places little weight on this factor. The Supreme Court has nevertheless cautioned that a factor may not be completely ignored simply because it is "susceptible of innocent explanation." *Arvizu*, 534 U.S. at 276-77. Thus, although the purported itinerary in this case was not so unusual or implausible as to independently suggest criminal activity, the uncommon nature of the travel plans, when combined with the other factors, may not be discounted entirely.

None of the factors relied on by the district court or the government would alone be sufficient to justify the prolonged detention. Indeed, the government concedes that when viewed independently, each of the factors is insufficient. This court may not, however, engage in a "divide-and-conquer analysis," evaluating and disposing of each factor individually. *Id.* at 274. Rather, this court "must consider the factors as a whole, giving due weight to the reasonable inferences of the resident district court and to [the officer's] expertise." *Santos*, 403 F.3d at 1133. Even factors which are not alone probative of illegal conduct may combine to amount to reasonable suspicion. *See Arvizu*, 534 U.S. at 277-78.

Applying this standard, this court concludes the totality of the circumstances gave Scimone a particularized and objective basis for suspecting Karam was engaged in criminal activity. Upon stopping Karam, Scimone noted the vehicle was a one-way rental traveling from Los Angeles to Akron. Karam later offered as an explanation for the one-way rental that he had flown to Los Angeles for a week-and-a-half vacation and then rented a vehicle to drive home so he could transport his niece's clothes and pictures. After entering Scimone's vehicle, Karam told Scimone he needed to use the restroom despite having just passed a truck stop and then made a statement which Scimone reasonably interpreted as a lie. Scimone then asked Karam questions about his vacation to which Karam responded only with vague answers. Karam not only was unable to remember the address where he had stayed in Los Angeles, but was unable to give

much detail about his location, responding at one point by saying he did not know where he had been staying. Karam also gave vague responses to Scimone's questions about the contents of the boxes in the back of his vehicle. Viewing these circumstances in the aggregate and giving due deference to the experience of the officer, Scimone had reasonable suspicion to justify detaining Karam pending the arrival of the canine unit. The district court therefore properly denied the motion to suppress.

**B. Application of Career Offender Sentencing Guideline**

Karam next argues the district court erred in applying the career offender sentencing guideline to calculate his advisory sentencing range. *See* USSG § 4B1.1. "[I]n considering the district court's application of the Guidelines, we review factual findings for clear error and legal determinations de novo." *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006). "Whether a defendant was erroneously classified as a career offender is a question of law subject to de novo review." *United States v. Mitchell*, 113 F.3d 1528, 1532 (10th Cir. 1997). Because this court concludes Karam's prior conviction was properly classified as a controlled substance offense pursuant to USSG § 4B1.2(b), the district court properly applied the career offender sentencing guideline.

Pursuant to USSG § 4B1.1(a), a defendant qualifies as a career offender if:

(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or

a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

USSG § 4B1.1(a). Karam does not dispute that he satisfies the first two criteria of the career offender guideline. Instead, he argues the district court improperly classified his 1995 Ohio conviction for trafficking in marijuana as a controlled substance offense. A controlled substance offense is "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense." *Id.* § 4B1.2(b). The application note explains this definition also includes the offenses of aiding and abetting, conspiring, and attempting to commit a controlled substance offense. *Id.* § 4B1.2 cmt. n.1. Further, this court has held § 4B1.2(b) encompasses "convictions for conduct that could have been charged as a controlled substance offense," even if the actual charged offense would not necessarily satisfy the definition. *United States v. Smith*, 433 F.3d 714, 717 (10th Cir. 2006).

To determine whether a prior conviction qualifies as a predicate offense for purposes of a sentencing enhancement, this court must look initially "to the fact of conviction and the statutory definition of the prior offense." *Taylor v. United*

*States*, 495 U.S. 575, 602 (1990). In the context of a guilty plea, where the statutory language is not conclusive, this court may look beyond the express language of the statute to the terms of the charging document, the terms of a written plea agreement, a transcript of the plea colloquy, and other explicit factual findings assented to by the defendant. *Shepard v. United States*, 544 U.S. 13, 16 (2005); *Smith*, 433 F.3d at 718. Although *Taylor* and *Shepard* each addressed the classification of a prior conviction for purposes of the Armed Career Criminal Act, their approach is equally applicable in the context of the career offender sentencing guideline. *See Smith*, 433 F.3d at 718 (applying *Shepard* to determine whether prior offense qualified as a controlled substance offense); *see also United States v. Galloway*, 439 F.3d 320, 323-24 (6th Cir. 2006) (concluding *Shepard* applies to determine whether prior conviction qualifies as a controlled substance offense under § 4B1.1); *United States v. McGee*, 408 F.3d 966, 988 (7th Cir. 2005) (explaining *Shepard* "applies with equal force to the guidelines' career offender provision").

The Ohio statute under which Karam was previously convicted makes it unlawful to "knowingly . . . [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, when the offender knows or has reasonable cause to believe the controlled substance is intended for sale or resale by the offender or another." Ohio Rev. Code Ann. § 2925.03(A)(2)

(1995).[3]  Karam argues a conviction under this statute cannot categorically

qualify as a controlled substance offense because the statute prohibits both

qualifying and non-qualifying conduct.  Specifically, Karam contends preparing

for shipment, shipping, and transporting drugs all may involve mere possession

and, thus, the statute may be violated by the possession of a controlled substance

with reasonable cause to believe the drugs are intended for sale.  He argues this

"reasonable cause to believe" mens rea standard falls short of intent and is

insufficient to satisfy the definition of a controlled substance offense, which

requires, *inter alia*, possession with intent to distribute.  USSG § 4B1.2(b).

There can be no dispute that a conviction for the delivery or distribution of

a controlled substance constitutes a controlled substance offense.  *See id.* ("The

term 'controlled substance offense' means an offense . . . that prohibits the . . .

distribution . . . of a controlled substance . . . ."); *United States v. Cherry*, 433

F.3d 698, 702 (10th Cir. 2005) ("[T]he term 'distribute' . . . means to

intentionally deliver narcotics to another person." (quotation and alterations

omitted)).  Nor can there be any dispute that (1) the preparation of a controlled

substance for distribution and (2) the commission of any of the prohibited acts

with drugs intended for sale by the defendant each involve possession with intent

to distribute and also fit squarely within the definition of a controlled substance

-----

[3]All references to Ohio Rev. Code Ann. § 2925.03 are to the version of the
statute in effect at the time of Karam's prior conviction in 1995.

offense. *See* USSG § 4B1.2(b). Thus, the resolution of Karam's appeal turns on whether the preparation for shipment, shipment, or transport of a controlled substance with knowledge or reasonable cause to believe the controlled substance is intended for sale by another constitutes the "manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense."[4] *Id.* Because each of these prohibited acts involves the actual distribution of a controlled substance rather than mere possession, this court need not address whether knowledge or reasonable cause to believe the controlled substance is intended for sale by another is equivalent to an intent to distribute.

While the relevant portion of the Ohio statute prohibits conduct which alone may consist of no more than mere possession, it does so only "when the offender knows or has reasonable cause to believe the controlled substance is intended for sale or resale by . . . another." Ohio Rev. Code Ann. § 2925.03(A)(2). This language makes clear that the statute prohibits only acts of distribution and does not extend to the possession of drugs for personal use. If an

_____

[4]In Karam's sentencing memorandum filed in the district court, he argued his 1995 conviction was not punishable by imprisonment for a term exceeding one year. At the sentencing hearing, however, he withdrew this objection and conceded the conviction carried a possible penalty of up to eighteen months' imprisonment. *See* Ohio Rev. Code Ann. § 2925.03(E)(2) (classifying a conviction under subsection (A)(2) for trafficking in marijuana as a felony of the fourth degree); *id.* § 2929.11(D)(2) (1995) ("For a felony of the fourth degree, the term shall be six months, one year, or eighteen months.").

individual has knowledge or reasonable cause to believe drugs are intended for sale by another, the preparation for shipment, shipment, or transport of those drugs cannot simply involve the possessory act of one person moving his own drugs, as Karam asserts. Rather, each of these acts is an integral part of the distribution process and is therefore an act of distribution in and of itself. Simply because the Ohio statute prohibits each of the various phases of the distribution process does not make any one of these intervening acts any less an act of distribution than the final step in the process. Additionally, the intended sale of the controlled substance by a third party necessarily requires the distribution of the controlled substance to that third party. There is, therefore, no way for a defendant to violate the Ohio statute without engaging in conduct which meets the definition of a controlled substance offense under USSG § 4B1.2(b).

The Sixth Circuit reached an opposite conclusion with respect to Ohio Rev. Code Ann. § 2925.03(A)(2) in *United States v. Montanez*. 442 F.3d 485, 493 (6th Cir. 2006). The central holding of *Montanez* addressed only Ohio Rev. Code Ann. § 2925.03(A)(6), which prohibited "possess[ing] a controlled substance in an amount equal to or exceeding three times the bulk amount," and § 2925.03(A)(9), which prohibited "possess[ing] a controlled substance in an amount equal to or exceeding one hundred times the bulk amount." *Id.* at 491-92 (quotations and alterations omitted). The court held that because each of these sections "contains *only* the element of 'possession,'" neither could qualify as a

controlled substance offense for purposes of USSG § 4B1.1. *Id.* at 492. In dicta, however, the court distinguished Ohio Rev. Code. Ann. § 2925.03(A)(2), which it characterized as covering both qualifying and non-qualifying conduct. *Id.* at 493. The court did not specify which portion of the statute it determined would not satisfy the definition of a controlled substance offense, but it appears the court was primarily focused on the distinction between "reasonable cause to believe" and intent to distribute, a distinction this court need not address in light of our conclusion that the prohibited conduct constitutes actual distribution. *See id.* at 493. To the extent *Montanez* can be read for the proposition that transporting or shipping a controlled substance with knowledge or reasonable cause to believe the controlled substance is intended for sale does not qualify as an act of distribution, this court disagrees with the Sixth Circuit dicta for the reasons discussed above.

Karam's reliance on this court's holding in *United States v. Herrera-Roldan* is also misplaced. 414 F.3d 1238 (10th Cir. 2005). In *Herrera-Roldan*, this court concluded the defendant's Texas conviction for mere possession was not a "drug trafficking offense," a term with a definition nearly identical to that of "controlled substance offense." *Id.* at 1240; USSG § 2L1.2 cmt. n.1(B)(iv) (defining "drug trafficking offense"). This court declined to infer an intent to distribute from the defendant's possession of more than fifty pounds, but not more than 2000 pounds, of marijuana. *Id.* at 1240-41. Unlike *Herrera-Roldan*, however, the statute under which Karam was previously convicted does not

-24-

prohibit mere possession.  Rather, as discussed above, the express language of the statute prohibits only the actual distribution of a controlled substance or the possession of a controlled substance with intent to distribute.  This court need not look beyond the language of the statute.

Because the statutory language of Karam's prior offense of conviction prohibits only conduct which is the "distribution . . . of a controlled substance . . . or the possession of a controlled substance . . . with intent to . . . distribute," the prior conviction categorically qualifies as a controlled substance offense.  USSG § 4B1.2(b).  The district court therefore did not err in applying the career offender guideline.

## IV.  Conclusion

For the foregoing reasons, this court **affirms** the denial of Karam's motion to suppress and the sentence imposed by the district court.

*United States v. Karam*, No. 06-8056.

**McCONNELL**, J., dissenting in part.


The Fourth Amendment question in this case is close and reasonable minds may differ. On balance, in my view, the officer lacked the objective and reasonable suspicion necessary to justify the detention. I therefore dissent from that holding of the majority. I concur in the majority's holding on the sentencing issue.