FILED
United States Court of Appeals
Tenth Circuit

**March 31, 2009**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

ALONSO MARQUEZ-DIAZ,

　　　　Defendant - Appellant.

No. 07-2014

D. N.M.

(D.C. No. CR-06-550 RB)

---

**ORDER**

---

Before **O'BRIEN**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

---

Appellant's petition for rehearing is granted for the limited purpose of amending the Order and Judgment filed on March 18, 2009, only to address Appellant's arguments concerning the inception of the traffic stop. In all other aspects, the petition for rehearing is denied.

The attached revised Order and Judgment is reissued nunc pro tunc. Additional petitions for rehearing in this matter will not be permitted.

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

**March 18, 2009**

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALONSO MARQUEZ-DIAZ,

Defendant - Appellant.

No. 07-2014

D. N.M.

(D.C. No. CR-06-550 RB)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

---

While traveling from El Paso, Texas, to Carrizozo, New Mexico, Alonso Marquez-Diaz was stopped for a traffic violation. Following the stop, a search of his truck revealed a large amount of cocaine hidden behind the dashboard. Marquez-Diaz appeals from the district court's denial of his motion to suppress the cocaine. The district court determined the state trooper did not unreasonably delay his investigation of the traffic violation and Marquez-Diaz voluntarily consented to the search of his vehicle. We affirm.

**I. BACKGROUND**[1]

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The facts are taken from Trooper Crayton's testimony at the suppression hearing and the videotape of the stop introduced into evidence. Crayton was the only witness at the hearing.

On February 23, 2006, Trooper Crayton was on Highway 54, approximately three miles south of Carrizozo, New Mexico, when he noticed a pickup truck traveling at the posted speed limit. While Crayton clocked the truck's speed, the truck slowed below the speed limit. Crayton decided to follow the truck to run the license plate to make sure "everything was on the up and up." (R. Vol. III at 9.) As Crayton pulled up to the truck, he was unable to read the license plate because the illuminating bulb was incorrectly positioned, causing a reflective glare. Under New Mexico law, a license plate number must be visible from within fifty feet of the vehicle. *See* N.M. Stat. § 66-3-805(C). Based on this violation, Crayton decided to stop the truck "to do a registration check" and "check the paperwork with the driver." (R. Vol. III at 10.)

Upon activating the red lights, the patrol car's videotape began recording – the time was 11:50 p.m.[2] The truck immediately pulled over to the side of the road. Before the truck came to a complete stop, Crayton was able to read the license plate number and report the number to dispatch. Crayton then walked up to the passenger side of the truck, shining his flashlight in the truck bed as he passed. The bed contained fishing gear and a tent. When he reached the cab, he saw an "air freshener[] and one key in the ignition" without accompanying keys on a key chain. (*Id.* at 15.) Crayton testified he had been trained that a single key and the presence of an air freshener are common indicators of drug transportation. He conceded, however, many people who are not associated with drugs have single keys and air fresheners.

---

[2] The timing of events is taken from the videotape of the traffic stop.

Two people were in the truck, the driver, Marquez-Diaz, and his passenger, Robert Cacho. Crayton stood at the passenger's window as he spoke with Marquez-Diaz. Crayton told Marquez-Diaz about the problem with his light and asked for his driver's license and registration. Crayton also asked Marquez-Diaz to step out of the truck and walk back to the patrol car. Marquez-Diaz complied, commenting on the cold temperature. As he left the truck, Marquez-Diaz pulled his jacket hood over his head and attempted to put his hands in his pockets. Trooper Crayton asked him to keep his hands visible. For officer safety, Crayton opened the patrol car's passenger door, positioning himself on one side and told Marquez-Diaz to stand by the right front tire.

In response to Crayton's questions, Marquez-Diaz told Crayton he was from a town near El Paso, Texas, and had decided on the spur of the moment to visit Carrizozo. He left home around eight or nine that night and planned to stay in a Carrizozo hotel. The purpose of the trip was to look around. After establishing "where [Marquez-Diaz is] going, where he's coming from, [and] what he's going to do there," Crayton reported the driver's license and registration numbers to dispatch and began to write a warning citation. (R. Vol. III at 20.) While waiting for a response from dispatch, Crayton asked Marquez-Diaz how long he would be in Carrizozo. Marquez-Diaz replied they planned to stay the weekend. Crayton then asked about his work; Marquez-Diaz told Crayton he was a truck driver. At that point, dispatch reported Marquez-Diaz was not wanted and there were no warrants for his arrest, the license was current and the registration was valid. The "all clear" occurred at approximately 11:57 p.m. - seven minutes into the stop.

-3-

Crayton asked the identity of the passenger. Marquez-Diaz responded the passenger's name was Robert and the two men had worked together. Crayton then asked if Marquez-Diaz knew anyone in Corrizozo. He replied, "No." Crayton next asked if he planned to go fishing. He said yes, but did not know where he would fish. At that point, Marquez-Diaz began asking Crayton a series of questions about Carrizozo, including where might be a good hotel to overnight and telling Crayton he had heard of a good local hamburger restaurant there. Crayton identified the hotels and a restaurant known for its good green chili cheeseburgers. After they discussed the deer population in New Mexico, Crayton informed Marquez-Diaz he was going to talk to the passenger. The time was approximately 12:01 a.m. - eleven minutes into the stop and four minutes after the all clear from dispatch.

At the suppression hearing, Crayton testified Marquez-Diaz appeared "just a little bit nervous." (*Id.* at 26.). He put his hands in his pockets, was "walking around," "at one point, he was . . . leaning on [the patrol] car. And at the end, he was kicking a hole in the dirt." (*Id.*) Crayton further stated his training classifies a suspect's meaningless conversational questions as an indicator the suspect may be trying to steer the conversation away from the officer's questions. However, Crayton immediately clarified this testimony; this is "not to say [Marquez-Diaz] did, but a lot of them are trained to try to deter us from asking . . . questions." (*Id.* at 26.)

Crayton decided to talk to the passenger "because [Marquez-Diaz's] story and all the indicators I was getting from Mr. Marquez . . . [it] wasn't good." (*Id.* at 30.) Crayton

-4-

recounted the "air freshener in the truck, a single key in the truck," the spontaneous trip to Carrizozo commenced between eight and nine at night, Marquez-Diaz's inability to name the hotel where he would stay, his travel from a border town, "and the biggest red flag . . . was the fisherman thing." (*Id.* at 30-31.) Crayton thought Marquez-Diaz's statement about going fishing especially significant because "being a fisherman, if I plan on going fishing somewhere and I'm going to drive, you know, four hours to get there, I know where I'm going to fish. And him having the equipment, he should have kn[own] where he was going." (*Id.* at 28.) Crayton stated Carrizozo would be an unlikely fishing destination because it had only a minimally stocked fishing pond used by the locals. Crayton determined to speak with Robert "to see if the passenger's statement matched with the defendant's." (*Id.* at 30.)

Crayton approached the passenger and asked for his license. The passenger produced a license identifying him as Robert Cacho. When asked where he was going, Cacho stated he was going to Carrizozo to meet his parents, who would be arriving the next day and staying at his cousin's house in Carrizozo. Cacho informed Crayton he and his parents were going to Las Vegas, New Mexico, the next day. When Crayton probed further, Cacho did not know his cousin's address or the name of the hotel where he and Marquez-Diaz would stay. When asked for Marquez-Diaz's first name, Cacho stated he did not know. Crayton described Cacho's demeanor as "just a blank stare, straight ahead," but after admitting he did not know the first name of the driver, "[h]e just set his head down." (*Id.* at 35.) The time was 12:02, twelve minutes into the stop and five

-5-

minutes after the all clear.

Crayton returned to the patrol car and again questioned Marquez-Diaz about his weekend plans. He asked if they planned to meet anyone in Carrizozo. Marquez-Diaz said no. Crayton then ran Cacho's driver's license through dispatch and requested both men's licenses be run through the EPIC system, a system that checks passport activity and identifies suspected drug runners.[3] The time was approximately 12:03 a.m. While waiting for the results, Crayton asked Marquez-Diaz why Cacho did not know his first name. Marquez-Diaz appeared surprised. Crayton asked what Cacho usually called him and he said by his first name. He told Crayton perhaps Cacho was nervous because they had been stopped by a trooper. The time was 12:07 a.m. - seventeen minutes into the stop and ten minutes after the all clear.

Crayton filled out a consent to search form while he questioned Marquez-Diaz. Before dispatch returned the all clear on Cacho's license and before receiving the EPIC results, Crayton returned Marquez-Diaz's documents and had Marquez-Diaz sign the warning ticket. After Marquez-Diaz signed, Crayton handed a copy of the warning citation to Marquez-Diaz, but did not tell him he was free to go.

Almost immediately, Crayton asked Marquez-Diaz if he could ask him a few more questions. Marques-Diaz said yes. Crayton repeated several of his earlier questions and

---

[3] EPIC is an acronym for El Paso Intelligence Center. The program was created as a regional intelligence center to collect and disseminate information relating to drug, alien and weapon smuggling from various government agencies. *See* El Paso Intelligence Center *available at* http://www.usdoj.gov/dea/programs/epic.htm (last visited Feb. 25, 2009).

then asked whether there were drugs, weapons or explosives in the truck; Marquez-Diaz replied no. Crayton then requested to search the truck. Marquez-Diaz agreed. Crayton handed Marquez-Diaz the consent to search form, told him it was in both Spanish and English, asked him to read it and sign it if he agreed to the search. Marquez-Diaz did so.[4] Crayton returned to the passenger side of the truck and asked Cacho for consent to search, handing Cacho the consent to search form, which Cacho read, signed and returned.

Given consent to search from both men, Crayton began searching at the back of the truck. As the search proceeded to the truck's cab, Crayton noticed the heater fan was running but no air was emitting from the vents. Crayton looked into the steering wheel shaft and saw a black cellophane-wrapped brick. He removed the package and punctured it with a knife, causing a white powdery substance to fly into his face.

Crayton drew his weapon, handcuffed the two suspects and placed them in the patrol car. After obtaining a search warrant for the truck, officers found thirty kilograms of cocaine inside the dash. Marquez-Diaz was indicted on conspiracy to possess with intent to distribute five kilograms and more of a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 846 (Count 1) and possessing with intent to distribute five kilograms or more of the same in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2 (Count 2).

Marquez-Diaz moved to suppress physical evidence and statements. The court

---

[4] Marquez-Diaz signed the consent form at 12:10 a.m. At 12:11 a.m., dispatch reported an all clear on Cacho's license and reported EPIC showed neither the driver nor the truck had crossed the border.

denied the motion, concluding: 1) the stop was based on Crayton's observation of a violation of New Mexico traffic laws; 2) further detention and questioning of Marquez-Diaz and Cacho did not exceed the scope or duration of a routine traffic stop and, if it did, Crayton's questions were justified by reasonable suspicion of illegal activity; and 3) in any event, Marquez-Diaz voluntarily consented to the search. Following the court's ruling, Marquez-Diaz pled guilty, reserving his right to appeal from the denial of his motion to suppress.

## II. DISCUSSION

"When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government, accepting the district court's factual findings unless clearly erroneous. Fourth Amendment reasonableness is reviewed de novo. The Government bears the burden of demonstrating reasonableness." *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1305 (10th Cir. 2006) (quotations and citations omitted). Marquez-Diaz claims: 1) the traffic stop was illegal because decreasing his speed was not a violation of law; 2) the subsequent detention was illegal because its scope and duration exceeded that justified by the purpose of the stop; 3) Crayton did not have reasonable suspicion of criminal activity to justify the extended questioning during the stop; and 4) the consent to search was not voluntary.

A.     Traffic Stop

A routine traffic stop "is governed by the principles developed for investigative detentions set forth in *Terry v. Ohio,* 392 U.S. 1 (1968)." *Guerrero-Espinoza*, 462 F.3d at

1307. Our inquiry is composed of two steps: "First we ask whether the officer's action was justified at its inception. If so, we then ask whether the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir.), *cert. denied*, 128 S. Ct. 636 (2007). "[W]e assess the reasonableness of a traffic stop based on an observed violation by considering the scope of the officer's actions and balancing the motorist's legitimate expectation of privacy against the government's law-enforcement-related interests." *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001); *see also Geurrero-Espinoza*, 462 F.3d at 1307 ("Reasonableness . . . depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."). "We view the officer's conduct through a filter of common sense and ordinary human experience." *United States v. Rice,* 483 F.3d 1079, 1083 (10th Cir. 2007) (quotations omitted).

1.      Inception of Traffic Stop

A traffic stop "based on an observed traffic violation" is reasonable at its inception. *United States v. Patterson*, 472 F.3d 767, 775 (10th Cir. 2006). At oral argument, Marquez-Diaz conceded Trooper Clayton observed a violation of New Mexico law. *See* N.M. Stat. § 66-3-805(C) ("Either a tail lamp or a separate lamp shall . . . illuminate . . . the rear registration plate and render it clearly legible from a distance of fifty feet to the rear."). As a result, Marquez-Diaz abandoned this claim. Nevertheless,

we address the issue.[5]

Marquez-Diaz argues that prior to observing the violation Crayton had no reasonable suspicion to follow him on the highway merely because he decreased his speed below the posted limit when he observed Crayton's vehicle. If the issue was not abandoned, it fails in substance. Marquez-Diaz does not cite to, nor has our research revealed, a constitutional requirement that law enforcement officers must have a reasonable suspicion before following a vehicle on a public roadway, even if they do so hoping to discover a violation justifying a stop. Marquez-Diaz was not prevented from proceeding on his journey and, thus, there was no "stop" before Crayton observed the license plate violation.

Moreover, we do not consider an officer's motivation when making a stop. "It is . . . irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Botero-Ospina*, 71 F.3d 783,

---

[5] In his petition for rehearing, Marquez-Diaz says he did not abandon his claim that the stop was invalid at its inception. The oral argument recording reveals the Court asked, "And so it was a valid traffic stop at its inception?" Counsel responded, "True, I am willing to let that go." The Court then asked what violation was being claimed. Counsel discussed the reduced speed which led to questions as to the harm resulting from Crayton's actions. Counsel replied, "I guess at that point I am not really harmed." Counsel did not return to these issues but proceeded to argue the duration of the stop was unconstitutional. Giving the argument transcript a most charitable reading, counsel may not have wanted to waste more time on a losing issue and simply acquiesced, thinking the matter would be passed rather than being deemed abandoned. For that reason we address the merits of the argument.

787 (10th Cir. 1995) (quotations omitted).  Our cases are clear.  Once there is a violation

of state law, an officer need not look the other way but may temporarily detain the vehicle

while requesting a driver's license and vehicle registration, running a criminal history

check and issuing him a warning ticket.  *See United States v. Lyons*, 510 F.3d 1225, 1235

(10th Cir. 2007), *cert. denied*,128 S. Ct. 1915(2008); *United States v. Karam,* 496 F.3d

1157, 1161 (10th Cir. 2007).  Marquez-Diaz does not dispute Crayton's observation that

the license plate could not be seen from the required distance, which further investigation

revealed, was the result of defective equipment.  The stop was constitutional at its

inception.

       2.      Length and Scope of Stop

In addition to being justified at its inception, a lawful traffic stop must be

"reasonably related in scope to the circumstances which justified the interference in the

first place." *Holt*, 264 F.3d at 1220 (quotations omitted).  "A seizure that is justified

solely by the interest in issuing a warning ticket to the driver may

become unlawful if it is prolonged beyond the time reasonably required to complete that

mission." *Illinois v. Caballes,* 543 U.S. 405, 407 (2005); *see also Lyons*, 510 F.3d at

1236-37.  "[B]oth the length and scope of a traffic stop are relevant factors in deciding

whether the stop comports with the Fourth Amendment." *United States v. Stewart*, 473

F.3d 1265, 1268 (10th Cir. 2007) (quotations omitted).

"[W]hen stopped for a traffic violation, a motorist expects to spend a short period

of time answering questions and waiting while the officer checks his license and

registration." *Holt*, 264 F.3d at 1220 (quotations omitted). "[M]otorists ordinarily expect to be allowed to continue on their way once the purposes of a stop are met. The government's interest in criminal investigation, without more, is generally insufficient to outweigh the individual interest in ending the detention." *Id.* at 1221 (quotations and citation omitted). "The . . . inquiry . . . is whether an officer's traffic stop questions extended the time that a driver was detained, regardless of the questions' content." *Stewart*, 473 F.3d at 1268 (quotations omitted).

Marquez-Diaz does not contend Crayton impermissibly questioned him while waiting for the results of his license check. Rather, he argues the duration and scope of the traffic stop were unreasonably extended when Crayton continued questioning him and his passenger *after* dispatch confirmed he owned the truck and had no outstanding warrants. He claims Crayton unreasonably delayed completing the written warning so he could gather evidence of other illegal activity.

### a. Questioning of Marquez-Diaz

Marquez-Diaz argues Officer Crayton should have finished writing the warning and immediately allowed the travelers to be on their way after receiving the all clear from dispatch. But a careful review of the videotape reveals the conversation between Crayton and Marquez-Diaz following the all clear resulted primarily from Marquez-Diaz's questions to Crayton – Crayton asked a couple of short questions but Marquez-Diaz kept up a chatter, asking questions of the officer. "When a defendant's own conduct contributes to a delay, he or she may not complain that the resulting delay is

-12-

unreasonable." *Patterson,* 472 F.3d at 777 (quotations omitted) (officer not unreasonable to wait to finish citation while driver conversed). Viewing the evidence in the light most favorable to the government, Crayton did not act unreasonably when he chose not to unilaterally terminate the encounter but to continue the conversation he was having with Marquez-Diaz. The conversation ended when Crayton's suspicions were sufficiently aroused that he decided to question the passenger. The time was approximately 12:01 a.m., four minutes after the all clear and eleven minutes into the stop.

### b. Questioning of the Passenger

Marquez-Diaz complains the stop was also unreasonably delayed when Crayton ended the conversation with him in order to return to the passenger side of the truck and question Cacho. The district court rejected this argument, determining Crayton did not exceed the scope of the stop and, in the alternative, he had an "objectively reasonable and articulable suspicion of illegal activity to justify prolonging the detention." (R. Vol. I, Doc. 41 at 16.)

The government claims Crayton "could request identification and run a background check on Cacho without any 'additional reasonable suspicion' of criminal activity," citing *Rice*, 483 F.3d at 1084. (Appellee's Br. at 18.) In *Rice*, we held the officer did not exceed the scope of the stop when he ran a background check on the two passengers as well as the driver after stopping a car for a tag light violation. *Id.* However, the officer had not received an all clear on the driver before checking the passengers' identification. Though an officer may question passengers and run a

-13-

background check, he may not do so merely to delay the stop. "[A] driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning." *United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir. 2006) (quotations omitted). In this case, Crayton had the all clear and the only remaining task was to issue the warning.

The government also claims Crayton's "brief questioning of Cacho did not appreciably lengthen the detention," citing *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006). There, however, the officer questioned the driver for a period of only thirty-eight seconds after receiving the all clear. *Id.* at 441 F.3d at 1256-57. Here, Crayton ended his conversation with Marquez-Diaz but did not then issue the warning ticket. Instead, he went to investigate whether Cacho would corroborate Marquez-Diaz's story. This situation is unlike taking a few seconds to wrap up and send the driver on his way. Crayton needed reasonable suspicion of illegal activity in order to continue the stop.

3. Reasonable Suspicion

In determining whether an officer has reasonable suspicion to detain a driver after the purpose of the stop is completed, we look to "the totality of the circumstances to see whether the officer had a particularized and objective basis for suspecting legal wrongdoing." *United States v. Williams,* 403 F.3d 1203, 1207 (10th Cir. 2005) (quotations omitted). "This process allows officers to draw on their own experience and

-14-

specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person." *United States v. Santos,* 403 F.3d 1120, 1134 (10th Cir. 2005) (quotations omitted). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

Crayton testified his suspicions were primarily aroused by "the fisherman thing" – "[y]ou know, if you plan a trip, then you know where you're going to be staying, and you know . . . he has a tent, so he should have known that he was camping out or thinking about camping out . . . . And just the shortness of all of a sudden going, *Yeah let's go down to Carrizozo and go fishing from El Paso*." (R. Vol. III at 31.) Crayton found these plans highly questionable. "Implausible travel plans can contribute to reasonable suspicion." *Santos*, 403 F.3d at 1129. Moreover, we "accord deference to an officer's ability to distinguish between innocent and suspicious actions." *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003).

The district court found reasonable suspicion of illegal activity based on Crayton's assessment of the travel plans, his awareness of the indicators of criminal smuggling activity, the proximity to the border and the lateness of the travel. The court also considered:

> Officer Crayton's knowledge that: (1) Marquez-Diaz appeared unusually
> nervous after exiting the truck; (2) Carrizozo is a very small town, with an
> estimated population of 1500 persons; (3) Carrizozo is hardly a fishing
> Mecca, with only one fish-stocked tank; and (4) Marquez-Diaz repeatedly

-15-

tried to engage him in conversation, which the officer knew to be a common drug-trafficker practice in trying to divert the officer's attention.

(R. Vol. 1, Doc. 41 at 17.) (footnote omitted). As the district court acknowledged, any one of these factors, standing alone, may be inadequate to establish reasonable suspicion. We do not, however, "divide and conquer" by considering each factor in isolation. *See Karam*, 496 F.3d at 1165.

This a close, and somewhat troubling, case. But, assessing the encounter as a whole and according deference to the district court's fact finding, we agree the circumstances established: 1) the initial four-minute delay after the all clear was due primarily to Marquez-Diaz, not the officer; 2) Crayton had reasonable suspicion of criminal activity sufficient to continue the traffic stop for a short time (one minute, as it happened) in order to question Cacho; 3) Crayton's conversation with Cacho heightened his suspicion of criminal activity and justified the continuation of the stop in order to again question Marquez-Diaz and run the EPIC check. Cascading events serially and incrementally added to Crayton's suspicion of crime underfoot and each event reasonably justified the delay occasioned by his further inquiry.

Marquez-Diaz faults the district court for considering his nervousness in evaluating Crayton's reasonable suspicion. However, the court considered this but one factor in its analysis. When a driver "detained for a routine traffic violation . . . shows unusual signs of nervousness," that behavior may be considered in the district court's analysis. *Santos*, 403 F.3d at 1127. The court's conclusion that Marquez-Diaz was

-16-

"unusually nervous after exiting the truck" is supported by the video showing Marquez fidgeting, placing his hands in his pockets after being told not to, chattering about the weather and other unrelated topics, and leaning on the hood of Crayton's patrol car. (*Id.* at 17.)

Reasonable suspicion "need not rise to the level required for probable cause and falls well short of meeting a preponderance of the evidence standard." *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir. 2003) (citing *Arvizu*, 534 U.S. at 274 (additional citation omitted)). The facts found and relied on by the district court are sufficient for it to conclude Crayton had reasonable suspicion to continue the stop for short time while he questioned the passenger. Within that one minute of questioning, Cacho presented a story quite different from that told by Marquez-Diaz. And his demeanor suggested guilty knowledge. Cacho's tale invited the inference of fabrication and reasonably heightened Crayton's evolving suspicion. It prompted Crayton to again question Marquez-Diaz and further extend the stop, reasonably we think. The second short round of questioning of Marquez-Diaz was the nail in the coffin as it led to the request to search, agreed to by both Marquez-Diaz and Cacho.[6]

4. Consent to search

Marquez-Diaz contends his consent to search was not obtained in a manner consistent with the Fourth Amendment. He maintains Crayton's request for permission,

---

[6] The district court did not discuss whether probable cause existed prior to the request to search. Our review of the evidence suggests such a finding could have found support in the record.

-17-

made immediately after return of Marquez-Diaz's documents and without notice he was free to leave, is insufficient to relieve the taint of his unconstitutional seizure. We see it differently.

"[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search." *United States v. Forbes*, 528 F.3d 1273, 1277-78 (10th Cir.), *cert. denied*, 129 S.Ct. 477 (2008). In instances when a constitutional violation precedes a search, consent is valid only if "the government [proves], from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent." *United States v. Gregory,* 79 F.3d 973, 979 (10th Cir. 1996) (quotations omitted). However, we have found no constitutional violation here, as the continuation of the stop was based on reasonable suspicion. Therefore, the only question is whether the consent to search was voluntary.

The district court reasoned:

Officer Crayton returned Marquez-Diaz and his passenger's documents *before* asking if he could search the truck. The request was made by a single officer, in public view, alongside U.S. 54. And, significantly, Officer Crayton asked for Marquez-Diaz's consent in a non-intimidating tone . . . . Additionally, Marquez-Diaz signed a Consent to Search Form, further bolstering the conclusion that Marquez-Diaz voluntarily consented to the search. Although Officer Crayton neither read the form aloud nor asked [Marquez-Diaz] whether he understood the form, there is no evidence that Marquez-Diaz appeared unable to read, or otherwise understand, the document. Moreover, the officer told Marquez-Diaz that the form was available in both English and Spanish and encouraged him to complete the form in the language in which he was most fluent.

-18-

(R. Vol. I, Doc. 41 at 20-21) (citation omitted).

"An officer is not required to inform a suspect that she does not have to respond to his questioning or that she is free to leave. An unlawful detention occurs only when the driver has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way." *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005) (citations and quotation omitted). The videotape reveals Crayton did not hurry Marquez-Diaz and allowed him to take his time when he read the consent form. The form itself clearly stated Marquez-Diaz was free to refuse consent.

We find no reason to deviate from the significant deference given to the district court's factual findings on this issue. *See United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1118-19 (10th Cir.), *cert. denied*, 128 S.Ct. 417 (2007). There was but a single officer, no physical touching, no commanding tone of voice nor intimidating body language. *See Chavira*, 467 F.3d at 1291. Marquez-Diaz's consent was voluntary and the court did not err in denying his motion suppress the evidence.

**AFFIRMED**.

**Entered for the Court:**

**PER CURIAM**

-19-